310 Ga. 32
FINAL COPY

S19G1491.  PREMIER HEALTH CARE INVESTMENTS, LLC v.
UHS OF ANCHOR, L.P.

WARREN, Justice.

In 2005, the Georgia Department of Community Health ("the Department") promulgated a rule, commonly known as the "Psychiatric Rule" ("the Rule"), that requires hospitals to obtain a Certificate of Need ("CON") "prior to the establishment of a new or the expansion of an existing acute care adult psychiatric and/or substance abuse inpatient program," and defines "expansion" as "the addition of beds to an existing CON-authorized or grandfathered psychiatric and/or substance abuse inpatient program."  Ga. Comp. R. & Regs. r. 111-2-2-.26 (1) (a), (2) (c).  This case is about whether the Department can, through the Rule, require a licensed hospital with a psychiatric/substance-abuse program that is authorized by a CON, see OCGA § 31-6-40 et seq., to obtain an additional CON to redistribute inpatient beds in excess

of those identified in its CON to operate a psychiatric/substance-abuse program, but within its total licensed bed capacity. In *UHS of Anchor, L.P. v. Dept. of Community Health*, 351 Ga. App. 29 (830 SE2d 413) (2019), the Court of Appeals held that the Department can. We granted certiorari to examine

> [w]hether the Court of Appeals erred in holding that the Department of Community Health was authorized to promulgate a rule, Ga. Comp. R. & Regs. r. 111-2-2-.26 (1) (a), to create a category of institutional health services requiring a certificate of need, when such category is not listed in OCGA § 31-6-40 (a).

For the reasons explained below, we answer that question "yes," and therefore reverse the decision of the Court of Appeals.

1. *Procedural history.*

(a) *Administrative proceedings and judicial review.*

Premier Health Care Investments, LLC d/b/a Flint River Hospital ("Flint River"), is a general acute care hospital that has obtained a CON for 49 total inpatient beds. In 2010, Flint River also obtained a CON to "[e]stablish [a] 12-bed Adult (Geriatric)

Psychiatric Program" at its hospital.[1]  Since that time, however, it has "redistributed" some of its inpatient beds and has been operating up to 30 psychiatric/substance-abuse beds — 18 more than the 12 authorized by the 2010 CON, but no more than the 49 total beds for which the hospital is licensed.

In 2016, Lake Bridge Behavior Health System, a competitor of Flint River and a sister facility of UHS of Anchor, L.P. d/b/a Southern Crescent Behavioral Health System ("Southern Crescent"), wrote to the Department, alleging that Flint River was operating beyond its CON authorization by operating more than 12 psychiatric/substance-abuse beds.  The Department investigated and initially agreed with Southern Crescent, concluding that Flint River had expanded its psychiatric/substance-abuse services by "offering . . .  services beyond the scope of its twelve (12) CON authorized adult psychiatric/substance abuse inpatient beds."  The Department issued a cease-and-desist letter to Flint River.

---

[1] It is undisputed that Flint River's CON-approved psychiatric program is authorized to operate psychiatric and/or substance-abuse inpatient beds.

Flint River appealed to the Department, arguing that OCGA § 31-6-40 (a) (pertaining to when a CON is required) governs when a "new institutional health service" requires CON approval, and that because Flint River's redistribution of beds within its total approved inpatient bed capacity did not fall within OCGA § 31-6-40 (a)'s definition of a new institutional health service requiring CON approval, no CON was required for the bed redistribution. It further argued that the Department, through the Psychiatric Rule, could not require Flint River to obtain a CON for bed redistribution because the Rule impermissibly expanded the Department's authority. Southern Crescent intervened in the administrative appeal, arguing that Flint River's operation of more than 12 psychiatric/substance-abuse beds was beyond the scope of its CON in violation of OCGA § 31-6-41 (a) (pertaining to the valid "scope" of CONs), and that Flint River was required under OCGA § 31-6-40 (a) and the Psychiatric Rule to obtain a new CON before redistributing psychiatric/substance-abuse beds. At that stage, the Department maintained that under the Rule, Flint River was required to obtain

a CON before it could increase additional beds for psychiatric/substance-abuse treatment through redistribution. The Department hearing officer agreed with Southern Crescent and the Department and affirmed the cease-and-desist order.

Flint River requested that the Department's Commissioner review that decision. The Commissioner reversed the hearing officer's decision and issued the "Final Order of the Department," which vacated the cease-and-desist order. Among other things, the Commissioner disagreed "that the reconfiguration of [Flint River's] beds within existing licensed capacity by [Flint River] is governed by OCGA § 31-6-41 (a)" and "that the CON statute does not allow for the flexing of beds between categories," and concluded that "the controlling statute governing analysis of whether [Flint River] impermissibly expanded the number of beds in its acute care adult psychiatric and substance abuse inpatient program is . . . OCGA § 31-6-40."

Southern Crescent filed a Petition for Judicial Review, arguing that the Department's order was inconsistent with the Psychiatric

Rule and that the Rule should control. The Superior Court of Fulton County, however, affirmed the Department's final order. The Court of Appeals then granted Southern Crescent's application for a discretionary appeal.

(b)   *Court of Appeals's opinion.*

The Court of Appeals reversed, disagreeing "with the Department's conclusion that [because] Flint River 'flexed' — i.e., reallocated or redistributed — beds from one approved service to use in another approved service without increasing the total number of beds within the facility as a whole," it "was not required to obtain a CON prior to initiating this change." *UHS of Anchor*, 351 Ga. App. at 42.

Among other things, the Court of Appeals reasoned that the Psychiatric Rule "explicitly requires that a CON be obtained 'prior to . . . the expansion of an existing acute care adult psychiatric and/or substance abuse inpatient program,'" and that "'expansion' is defined within that Rule to mean 'the addition of beds to an existing CON-authorized or grandfathered psychiatric and/or substance

abuse inpatient program.'" Id. (quoting Ga. Comp. R. & Regs. r. 111-2-2-.26 (1) (a), (2) (c)). The Court of Appeals acknowledged that "OCGA § 31-6-40 (a) does not specifically include the expansion of existing programs in its list of 'new institutional health services' that are required to obtain a CON," but concluded that the "list is not exclusive." Id. And it reasoned that based on OCGA § 31-6-21 (pertaining to Department's rulemaking authority), "the Department saw fit to require by its Rules that the expansion of an existing psychiatric and/or substance abuse facility requires a CON," and that "[t]his rule is consistent with the statutory specification that CONs are 'valid *only for* the defined *scope* . . . approved by the department.'" Id. at 43 (emphasis in original) (quoting OCGA § 31-6-41 (a)).

The Court of Appeals thus concluded that the Rule was not "an unauthorized 'enlargement' of the scope of the CON statute," but rather that,

> in the context of the statutory scheme as a whole, the most sensible interpretation of OCGA § 31-6-40 is that "includes" introduces a nonexclusive list, with the

Department free to promulgate by rule additional categories of "new institutional health services," *but only* so as to administer and implement the [CON] program and the strictures placed upon that program by the General Assembly.

*UHS of Anchor*, 351 Ga. App. at 44, 46 (emphasis in original).

2. *Statutory and regulatory background.*

In determining whether the Department was authorized to promulgate a rule to create a category of "new institutional health service" requiring a CON, see OCGA § 31-6-40 (a), we first look to the relevant legal texts. Those include a comprehensive statutory scheme defining and establishing the CON program, as well as regulations the Department has promulgated with respect to CONs.

(a) *Current statutory landscape.*

OCGA § 31-6-40 (a) establishes when a new institutional health service requires a CON. It provides:

> (a) On and after July 1, 2008, *any new institutional health service* shall be required to obtain a certificate of need pursuant to this chapter. *New institutional health services include:*
>
> > (1) The construction, development, or other establishment of a new, expanded, or relocated health

care facility, except as otherwise provided in Code Section 31-6-47;

(2) Any expenditure by or on behalf of a health care facility in excess of $10 million which, under generally accepted accounting principles consistently applied, is a capital expenditure, except expenditures for acquisition of an existing health care facility . . . ;

(3) The purchase or lease by or on behalf of a health care facility or a diagnostic, treatment, or rehabilitation center of diagnostic or therapeutic equipment, except as otherwise provided in Code Section 31-6-47;

(4) *Any increase in the bed capacity of a health care facility except as provided in Code Section 31-6-47*;[2]

(5) Clinical health services which are offered in or through a health care facility, which were not offered on a regular basis in or through such health care facility within the 12 month period prior to the time such services would be offered;

(6) Any conversion or upgrading of any general acute care hospital to a specialty hospital or of a facility such that it is converted from a type of facility not covered by this chapter to any of the types of health care facilities which are covered by this chapter;

---

[2] "Bed capacity" is defined as "space used exclusively for inpatient care, including space designed or remodeled for inpatient beds even though temporarily not used for such purposes." OCGA § 31-6-2 (4).

OCGA § 31-6-47 provides a list of exemptions for which Chapter 6 of Title 31, and thus the CON requirements, do not apply. The parties do not argue that any of the OCGA § 31-6-47 exemptions apply here.

(7) Clinical health services which are offered in or through a diagnostic, treatment, or rehabilitation center which were not offered on a regular basis in or through that center within the 12 month period prior to the time such services would be offered, but only if the clinical health services are any of the following:

    (A) Radiation therapy;

    (B) Biliary lithotripsy;

    (C) Surgery in an operating room environment, including but not limited to ambulatory surgery; and

    (D) Cardiac catheterization.

OCGA § 31-6-40 (a) (2009) (emphasis supplied).[3]

The enumerated list of new institutional health services that require a CON has changed over time. For example, for several years, CON approval was specifically required for "[a] change in bed capacity of a health care facility which increases the total number of beds *or which redistributes beds among various categories*[.]" Ga. Code Ann. § 88-3302 (s) (1979) (emphasis supplied). But in 1983,

---

[3] In 2019, the General Assembly amended OCGA § 31-6-40 (a) to include an eighth new institutional health service requiring CON approval: "(8) The conversion of a destination cancer hospital to a general cancer hospital." OCGA § 31-6-40 (a) (8).

the General Assembly removed the language expressly requiring CON approval for bed redistribution, see OCGA § 31-6-2 (14) (1983), and it did not add that language back into the CON statute when it amended and moved the provision defining "new institutional health services" from the Article's general definition statute, OCGA § 31-6-2, to its current home in OCGA § 31-6-40 (a).

OCGA § 31-6-40 (b) provides that "[a]ny person proposing to develop or offer a new institutional health service or health care facility shall, before commencing such activity, . . . obtain a certificate of need in the manner provided in this chapter unless such activity is excluded from the scope of this chapter."  In addition, a CON issued under OCGA § 31-6-1 et seq. "shall be valid only for the defined scope, location, cost, service area, and person named in an application . . . and as such scope, location, service area, cost, and person are approved by the department[.]"  OCGA § 31-6-41 (a).

(b)  *Relevant regulations.*

The statutory framework that sets forth the CON program is not the only text relevant to our inquiry.  Indeed, "to administer the

certificate of need program[,]" the Department is authorized to "adopt, promulgate, and implement rules and regulations sufficient to administer the . . . certificate of need program[,]" to "establish, by rule, need methodologies for new institutional health services and health care facilities[,]" and to "establish service-specific need methodologies and criteria for . . . psychiatric and substance abuse inpatient programs[.]" OCGA § 31-6-21 (a), (b) (4) & (8).

As noted above, the rule relevant to this case is the Psychiatric Rule, which provides that a "Certificate of Need shall be required prior to the establishment of a new or the expansion of an existing acute care adult psychiatric and/or substance abuse inpatient program," and defines "'Expansion' or 'Expanded'" as "the addition of beds to an existing CON-authorized or grandfathered psychiatric and/or substance abuse inpatient program." Ga. Comp. R. & Regs. r. 111-2-2-.26 (1) (a), (2) (c).

3. *Analysis*

The plain text of OCGA § 31-6-40 (a) requires a CON for "any new institutional health service" and specifically prescribes that

"[n]ew institutional health services include" an enumerated list of items, one of which is "[a]ny increase in the bed capacity of a health care facility except as provided in Code Section 31-6-47[.]" Id. at (a) (4). The plain text of the Rule states that a CON "shall be required prior to the establishment of a new or the expansion of [i.e., 'the addition of beds to'] an existing acute care adult psychiatric and/or substance abuse inpatient program." Ga. Comp. R. & Regs. r. 111-2-2-.26 (1) (a), (2) (c). Thus, there is potential tension between the statute and the Rule.[4] As a result of this possible tension, we must construe the statute and examine the interplay between the statute and the Rule to determine whether OCGA § 31-6-40 (a) controls, or whether the requirements of the Rule (Ga. Comp. R. & Regs., r. 111-2-2-.26 (1) (a), (2) (c)), supplement the list in OCGA § 31-6-40 (a) on

---

[4] We note that the Department has filed an amicus curiae brief arguing that the Psychiatric Rule should not be read to "'enlarge' the scope of 'new institutional health services' as set forth in OCGA § 31-6-40 (a) by requiring CON approval for a redistribution of beds that does not increase a facility's total bed capacity," which "would render the rule an unconstitutional attempt to add to the 'legislative list' of 'new institutional health services.'" (quoting *North Fulton Med. Center v. Stephenson*, 269 Ga. 540, 543 (501 SE2d 798) (1998) and *HCA Health Svcs. of Ga., Inc. v. Roach*, 265 Ga. 501, 503 (458 SE2d 118) (1995)).

the question of whether a redistribution of beds among hospital services that does not result in an increase in a hospital's total licensed bed capacity constitutes a new institutional health service for which a CON is required.

(a) *Standard of review.*

"Judicial review of an administrative decision requires the court to determine that the findings of fact are supported by 'any evidence' and to examine [de novo] the soundness of the conclusions of law that are based upon the findings of fact." *Pruitt Corp. v. Ga. Dept. of Community Health*, 284 Ga. 158, 160 (664 SE2d 223) (2008). We are therefore "authorized to reverse or modify the agency decision upon a determination that the agency's application of the law to the facts is erroneous." Id. at 161. See also, e.g., *Sawnee Elec. Membership Corp. v. Ga. Pub. Svc. Comm.*, 273 Ga. 702, 706 (544 SE2d 158) (2001) ("[W]e are authorized to make an independent determination as to whether the interpretation of the administrative agency correctly reflects the plain language of the

statute and comports with the legislative intent.").[5]

(b) *The term "include" is susceptible to more than one interpretation.*

Whether redistribution of beds within a facility's total licensed bed capacity constitutes a new institutional health service that requires a CON turns largely on whether "include," as used in OCGA § 31-6-40 (a), is a term of limitation introducing an exhaustive list of seven "new institutional health services" for which a CON is

---

[5] In some circumstances, an agency's statutory interpretation may warrant deference by courts considering ambiguous statutes. See, e.g., *Tibbles v. Teachers Ret. Sys. of Ga.*, 297 Ga. 557, 558-559 (775 SE2d 527) (2015). But the kind of ambiguity that may warrant deference is only that ambiguity that remains "after we have exhausted all tools of construction." *City of Guyton v. Barrow*, 305 Ga. 799, 802-804 (828 SE2d 366) (2019) (holding that Georgia courts may "defer to an agency's interpretation" of its own regulation "only when we are unable to determine the meaning of the legal text at issue" and that the regulation at issue was not ambiguous, and therefore declining to reach the question of whether such deference should be reconsidered). As explained below, we conclude that the statute at issue here, which is determinative of the issue on appeal, is not ambiguous after we apply canons of statutory construction. Our case law thus does not support any deference to the Department's interpretation of the relevant CON statutes, or to its interpretation of its own unambiguous regulations. And, like in *City of Guyton*, this case does not present the question of whether that case law should be reconsidered.

required, or if it is instead an expansive term introducing a non-exhaustive list of examples of such services.[6]

"[A] statute draws its meaning . . . from its text." *Zaldivar v. Prickett*, 297 Ga. 589, 591 (774 SE2d 688) (2015) (citation and punctuation omitted). "To that end, we must afford the statutory text its plain and ordinary meaning, we must view the statutory text in the context in which it appears, and we must read the statutory text in its most natural and reasonable way, as an ordinary speaker of the English language would." *Deal v. Coleman*, 294 Ga. 170, 172-173 (751 SE2d 337) (2013) (citations and punctuation omitted). "[I]f the statutory text is clear and unambiguous, we attribute to the statute its plain meaning, and our search for statutory meaning is at an end." Id. at 173 (citation and punctuation omitted). But when the language of a statute or regulation "is not obvious on its face,"

---

[6] Notably, Southern Crescent did not argue at any stage of the proceedings below that OCGA § 31-6-40 (a) constitutes a non-exhaustive list of new institutional health services for which a CON is required. However, because the Court of Appeals concluded that the list of new institutional health services enumerated in OCGA § 31-6-40 (a) is not exclusive, see *UHS of Anchor,* 351 Ga. at 42, we address that question of statutory interpretation as a threshold matter.

we should employ other "tools of construction" to interpret it and resolve its meaning. See *City of Guyton v. Barrow*, 305 Ga. 799, 803-804 (828 SE2d 366) (2019).

An analysis of the word "include" or "including" in statutes construed by this Court, and in other case law, shows that there is more than one potentially plausible interpretation of "include": in some contexts, courts have held that "include," when used to introduce a list of items in a statute, indicates that the list is exclusive and exhaustive, whereas in other contexts, courts have concluded that "include" introduces a non-exclusive or illustrative list of examples. Legal treatises and dictionaries also acknowledge the possibility of different interpretations. See Bryan A. Garner, A Dictionary of Modern American Usage, 363 (1998) (although the word "include" "traditionally has introduced a nonexhaustive list, [it] is now . . . widely used . . . for consists of"). See also Shambie Singer, 2A Sutherland Statutes and Statutory Construction § 47:7 (7th ed. 2019 update) ("The word 'includes' is usually a term of enlargement, and not of limitation.") (citation and punctuation

omitted); Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts, 132 (2012) ("[T]he word *include* does not ordinarily introduce an exhaustive list.") (emphasis in original).

The two leading precedents from this Court, *Berryhill v. Ga. Community Support and Solutions, Inc.*, 281 Ga. 439 (638 SE2d 278) (2006), and *Wetzel v. State*, 298 Ga. 20 (779 SE2d 263) (2015), bear this out. In *Berryhill*, we construed "includes" in Georgia's anti-SLAPP statute in a limiting sense, so as to introduce an exhaustive list of which acts were included as being "'in furtherance of the right of free speech . . . in connection with an issue of public interest or concern,'" and thus covered by the statute. See 281 Ga. at 441-442 (quoting OCGA § 9-11-11.1 (c)).[7] In so doing, we noted that "[t]he

_____

[7] *Berryhill* concerned the statute's verification requirement, which applied to any "'act in furtherance of the right of free speech or the right to petition government for a redress of grievances . . . in connection with an issue of public interest or concern.'" *Berryhill*, 281 Ga. at 441 (quoting OCGA § 9-11-11.1 (c) (1998)). The statute provided that such an act:

> *includes* any written or oral statement, writing, or petition made before or to a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, or any written or oral statement, writing, or petition made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law.

OCGA § 9-11-11.1 (c) (1998) (emphasis supplied).

word 'includes' in and of itself is not determinative of how it is intended to be used," and "[w]hether the term may be interpreted as one of limitation depends on the context, the subject matter, and legislative intent." Id. at 441 (citations and punctuation omitted). "[F]or example, where a general term is followed by the word 'including,' which is itself followed by specific terms, the intent may be one of limitation." Id. (citation and punctuation omitted).

We reasoned that because the statute's general phrase, "'act in furtherance of the right of free speech or the right to petition government for a redress of grievances . . . in connection with an issue of public interest or concern,'" was "followed by [the] specific phrases, 'any written or oral statement, writing, or petition made before or to . . . , or . . . in connection with an issue under consideration or review by(,) a legislative, executive, or judicial body, or any other official proceeding,'" it was "clearly . . . reasonable to read the word 'includes' as meaning 'is equivalent to,' and to conclude that the specific phrases in subsection (c) set forth the entire definition" of the preceding general phrase. Id. In other

words, we concluded that the word "includes" was used in a "restrictive, limiting sense," meaning that "no other elements or items," beyond the specific phrases contained in OCGA § 9-11-11.1 (c), were "includable" in that list, but instead fell "outside of the definition." *Berryhill*, 281 Ga. at 441 (citation and punctuation omitted). We further explained that this construction was the "most reasonable" in context because "[a] broad construction of the term 'includes' would render the specific phrases in OCGA § 9-11-11.1 (c) superfluous"; "the General Assembly could have added, but did not add, catchall language at the end of" the statute; and "[m]ore importantly, if the legislature had intended to use the word 'includes' as a broad term of illustration or enlargement," then "it presumably would have appended the phrase 'but is not limited to,' just as it supplied the phrase 'but not limited to' after the word 'including' in [a different] subsection . . . of the very same . . . statute." Id. at 441-442.[8]

---

[8] Similarly, in *Covington Square Assoc., LLC v. Ingles Markets, Inc.*, 283 Ga. App. 307 (641 SE2d 266) (2007), the Court of Appeals construed "include"

More recently, however, we construed "including" in context as a term of expansion. In *Wetzel*, we held that "including," as used in a statute prohibiting the electronic furnishing of obscene material to minors, introduced a non-exhaustive list of how someone could make such material available to minors.[9] There, we reasoned that "including" was "followed by *only one* specified method of making stored computer information available," 298 Ga. at 32 (emphasis supplied), i.e., "'by operating a computer bulletin board,'" and "[i]f that single and straightforward method were meant to be the *only* prohibited way of 'allowing access to information stored in

_____

in a limiting sense in a lease agreement where it introduced a list of multiple specific items. See id. at 309-311 (lease agreement providing that "Common Area Costs" "shall *include* repairs to the parking areas or other Common Areas, lighting, removal of snow and ice, trash, rubbish and other refuse, general comprehensive liability insurance covering the Common Areas; fire, casualty and extended coverage on the Premises and the Shopping Center; and the cost of leasing or the depreciation on any equipment used to implement the foregoing maintenance" did not include security guard costs because the phrase "including but not limited to" in a separate lease provision implied that "include" in the relevant provision was to be read as a "limiting term, similar to 'shall consist of'") (punctuation omitted; emphasis omitted and in original).

[9] The statute at issue in *Wetzel* defined "electronically furnishes," in relevant part, as "'(t)o make available by allowing access to information stored in a computer, *including* making material available by operating a computer bulletin board.'" 298 Ga. at 31 (quoting OCGA § 16-12-100.1 (a) (3) (B) (1993)) (emphasis supplied).

a computer,' then the general phrase preceding 'including' would be surplusage," id. (emphasis in original). To support that construction, we provided a detailed review of the history and evolution of computer-based communications to explain why it "made sense" for the General Assembly specifically to enumerate this particular example of "making material available by operating a computer bulletin board" to "expand rather than restrict the reach of OCGA § 16-12-100.1." Id. at 32-35. See also *Coen v. Aptean, Inc.*, 307 Ga. 826, 829, 832 (838 SE2d 860) (2020) (construing "including" expansively as not excluding punitive damages in a statute entitling plaintiffs to "all damages allowed by law as proven by the evidence, *including* costs and expenses of litigation and reasonable attorney's fees" in abusive litigation cases — even though punitive damages were not specifically enumerated in the statute — because "the recovery of punitive damages" was "generally allowed in common law abusive litigation torts," meaning "there was good reason to be express in providing for" the recovery of "costs and expenses of litigation and reasonable attorney's fees" "while not similarly

spelling out the historically less disputed punitive damages") (punctuation omitted; emphasis supplied).

Other courts also construe "include" and its variants (such as "includes" or "including") depending on context. Federal courts, for example, often afford expansive constructions to statutes when a variant of "include" is followed by a list of only a few items. As just one example, in *United States v. Howard,* the Eleventh Circuit Court of Appeals concluded that where a statute provided that a building structure "'*includes* any vehicle, aircraft or watercraft used for the lodging of persons or carrying on business therein'" and "'*includes* any railroad box car or other rail equipment or trailer or tractor trailer or combination thereof,'" "[t]he items that follow each use of the word 'includes' in the statute are non-exhaustive examples of items that qualify as a 'structure.'" 742 F3d 1334, 1348 (11th Cir. 2014) (citation omitted; emphasis supplied and in original) (citation omitted).[10] Conversely, federal courts generally have construed

---

[10] See also, e.g., *Burgess v. United States*, 553 U.S. 124, 131 n.3 (128 SCt 1572, 170 LE2d 478) (2008) (noting that "[t]he word 'includes' is usually a term

"include" and its variants as a narrowing term when a variant of "include" is followed by a list of several items, or when the items that follow "include" are specific examples as opposed to general categories.[11]  See, e.g., *Carcieri v. Salazar*, 555 U.S. 379, 391-392 (129 SCt 1058, 172 LE2d 791) (2009) (where Congress "explicitly and comprehensively defined the term ['Indian'] by including only three discrete definitions," it "left no gap . . . for the agency to fill"); *Dong v. Smithsonian Inst.*, 125 F3d 877, 879-880 (D.C. Cir. 1997) (recognizing that "'includes' normally does not introduce an exhaustive list," but concluding that "includes" as used in the federal Privacy Act was a limiting term where the Act provided that the

---

of enlargement, and not of limitation.  Thus, a term whose statutory definition declares what it 'includes' is more susceptible to extension of meaning than where . . . the definition declares what a term 'means'") (citation and punctuation omitted); *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 189 (61 SCt 845, 85 LE 1271) (1941) (construing "including" expansively in a statute allowing an agency "to take such affirmative action, including reinstatement of employees with or without back pay, as will effectuate the policies of this Act") (punctuation omitted).

[11] We do not decide whether there is a hard-and-fast rule that the number of items in a list that follows "include" dictates whether the statute must be construed expansively or in a narrowing sense.  We merely note how this Court and other courts have construed similar statutes to aid our analysis of how to interpret the statute presented here.

term "agency" "includes" multiple specified categories without any "general principle in sight").

In sum, this Court and other courts have construed "includes" as both a term of limitation and as a term of expansion in the context of different statutes. Particularly for this Court, the upshot of these cases is that "[a]s used in statutes, the word 'including' and the specific terms that follow it may serve to expand, to limit, or to confirm by illustration the meaning of a more general term that precedes it" and "[d]etermining the sense in which the legislature used 'including' in a particular statute depends on the exact language, context, and subject matter of the statute." *Wetzel*, 298 Ga. at 32 (citing *Berryhill*, 281 Ga. at 440-442).

(c) *In context, "include," followed by seven specifically enumerated examples in OCGA § 31-6-40 (a), introduces an exhaustive list of "new institutional health services" for which a CON is required.*

At its most basic level, Flint River's textual argument is that OCGA § 31-6-40 (a) sets out the exclusive "statutory list of 'new

institutional health services' for which a CON is required," that this list — which is established by the General Assembly — "does not include reconfiguration of beds when the provider is not offering a new clinical health service and when the facility's total number of beds does not increase," and that "only the General Assembly" — and not the Department — "can add to that statutory list." We agree that "include," as it is found in OCGA § 31-6-40 (a), is used in a limiting sense, introducing an exhaustive list of new institutional health services for which a CON is required.

A number of textual and contextual indicators lead us to that conclusion. First and foremost, the structure of OCGA § 31-6-40 (a): the list of new institutional health services for which a CON is required is comprised of seven (now eight) specific, detailed, and considerably distinctive items, and is introduced by the term "include." In other words, because the general phrase "any new institutional health service shall be required to obtain a certificate of need pursuant to this chapter[,]" OCGA § 31-6-40 (a), is "followed by the word 'includ[e],' which is itself followed by specific phrases, .

. . it clearly is reasonable to read the word 'includ[e]' as meaning 'is equivalent to,' and to conclude that the specific phrases . . . set forth the entire definition," see *Berryhill*, 281 Ga. at 441. Thus, the meaning of "include" in OCGA § 31-6-40 (a) more closely mirrors our interpretation of the anti-SLAPP statute we construed in *Berryhill* — "where 'includes' was followed by two very detailed specific phrases," *Wetzel*, 298 Ga. at 32 (citing *Berryhill*, 281 Ga. at 441),[12] than our interpretation of a criminal statute in *Wetzel*, where "'including' . . . is followed by only one specified method of making stored computer information available," *Wetzel*, 298 Ga. at 32. Cf. *Coen*, 307 Ga. at 831-840.

Our interpretation also aligns with how other courts have interpreted "include" or its variants in similar contexts. See, e.g., *Covington Square Assoc., LLC v. Ingles Mkts., Inc.,* 283 Ga. App. 307, 309-311 (641 SE2d 266) (2007); *Carcieri*, 555 U.S. at 391-392;

---

[12] If two specific examples following "includes" in the anti-SLAPP statute at issue in *Berryhill* was enough for us to conclude that the statutory list was exhaustive, see *Wetzel*, 298 Ga. at 32, we see no basis for reaching the opposite conclusion here, where seven (now eight) specific and distinctive items follow "include" in the CON statute.

*Dong*, 125 F3d at 879-880. And Southern Crescent has pointed to no cases, from this Court or others, holding that "include," followed by a list of anything close to seven specific and distinctive items, results in that portion of the statute being interpreted expansively rather than exhaustively.

Second, "a broad[er] construction of the term 'include[ ]' would render the specific phrases in" OCGA § 31-6-40 (a) (1)-(7) "superfluous" insofar as it would have been "wholly unnecessary for the legislature to state that the general phrase encompasses [so many] particular acts," *Berryhill*, 281 Ga. at 441-442, if the list were meant to be illustrative instead of an exhaustive list of specific new institutional health services for which a CON is required. And it is well established that a statute "should be construed to make all its parts harmonize and to give a sensible and intelligent effect to each part." *Hall County Bd. of Tax Assessors v. Westrec Props., Inc.*, 303 Ga. 69, 77 (809 SE2d 780) (2018). See also *Wetzel*, 298 Ga. at 32-33 (contrasting the statutory construction in *Berryhill* and similar cases, where "reading the list of multiple specified phrases following

'including' as merely illustrative of the preceding phrase would tend to render the specific phrases essentially superfluous," to that in *Wetzel*, where treating a "single and straightforward method" listed after "including" as "the *only* prohibited way of 'allowing access to information stored in a computer,' [would render] the general phrase preceding 'including' . . . surplusage") (emphasis in original).

Third, the broader statutory context of OCGA § 31-6-40 (a) reveals that the General Assembly used the phrase "including but not limited to" elsewhere in the very same statutory provision to introduce illustrative examples. See, e.g., OCGA § 31-6-40 (a) (7) (C) ("Clinical health services which are offered in or through a diagnostic, treatment, or rehabilitation center which were not offered on a regular basis in or through that center within the 12 month period prior to the time such services would be offered, but only if the clinical health services are any of the following: . . . Surgery in an operating room environment, *including but not*

*limited to* ambulatory surgery[.]") (emphasis supplied).[13] Unlike the

Court of Appeals, see *UHS of Anchor*, 351 Ga. App. at 42-47, we

---

[13] The General Assembly similarly used the phrase "including but not limited to" throughout the same Code chapter. See, e.g., OCGA §§ 31-6-40.3 (c) (1) ("The general cancer hospital may continue to provide all institutional health care services and other services it provided as of the date of such conversion, *including but not limited to* inpatient beds, outpatient services, surgery, radiation therapy, imaging, and positron emission tomography (PET) scanning, without any further approval from the department[.]") (emphasis supplied); 31-6-40.3 (c) (2) ("The destination cancer hospital shall be classified as a general cancer hospital under this chapter and shall be subject to all requirements and conditions applicable to hospitals under this article, *including but not limited to*, indigent and charity care and inventories and methodologies to determine need for additional providers or services[.]") (emphasis supplied); 31-6-42 (a) (15) (issuance of CON depends, in part, on whether "[t]he proposed new institutional health service meets the department's minimum quality standards, *including but not limited to*, standards relating to accreditation, minimum volumes, quality improvements, assurance practices, and utilization review procedures") (emphasis supplied); 31-6-45 (a) ("The department may not, however, revoke a certificate of need if the applicant changes the defined location of the project within the same county less than three miles from the location specified in the certificate of need for financial reasons or other reasons beyond its control, *including, but not limited to*, failure to obtain any required approval from zoning or other governmental agencies or entities, provided such change in location is otherwise consistent with the considerations and rules applied in the evaluation of the project.") (emphasis supplied); 31-6-47 (a) (10.1) (providing chapter does not apply to "the replacement of equipment, *including but not limited to* CT scanners . . . previously approved for a certificate of need") (emphasis supplied); 31-6-50 ("The review and appeal considerations and procedures set forth in Code Sections 31-6-42 through 31-6-44, respectively, shall apply to and govern the review of capital expenditures under the Section 1122 program of the federal Social Security Act of 1935, as amended, *including, but not limited to*, any application for approval under Section 1122. . . .") (emphasis supplied).

conclude that the use of "including but not limited to" in one subprovision of OCGA § 31-6-40 (a) but not in another indicates that the General Assembly intended for "including but not limited to" to introduce a list of illustrative examples, whereas the use of "include" followed by an enumerated list of items introduces an exhaustive list.[14]  See *Berryhill*, 281 Ga. at 442 ("[I]f the legislature had intended to use the word 'includes' as a broad term of illustration or enlargement, it presumably would have appended the phrase 'but is not limited to,' just as it supplied the phrase 'but not limited to' after

---

[14] Although the Court of Appeals acknowledged that OCGA § 31-6-40 (a) "does not specifically include the expansion of existing programs in its list of 'new institutional health services' that are required to obtain a CON" and that the term "'include' may be interpreted as a word of limitation *or* enlargement," and likewise recognized the many instances in which the General Assembly used the phrase "including but not limited to" in the very same Code chapter where OCGA § 31-6-40 is located, it assigned little weight to the text and the statutory context of OCGA § 31-6-40 (a) and instead placed undue reliance on the General Assembly's delegation of regulatory authority to the Department to "adopt, promulgate, and implement rules and regulations sufficient to administer the provisions" of the relevant Code chapter.  See *UHS of Anchor*, 351 Ga. App. at 42-47 (citations and punctuation omitted).  Similarly, Southern Crescent points to the Department's "broad authority to promulgate rules under the CON Statute" as a reason why OCGA § 31-6-40 (a) is merely illustrative, reasoning that "[i]nterpreting OCGA § 31-6-40 to be an exhaustive list would frustrate that authority."  We discuss the Court of Appeals's and Southern Crescent's reliance on the General Assembly's delegation below in Division 3 **Error! Reference source not found.**.

the word 'including' in subsection (f) of the very same anti-SLAPP statute being construed in this case.").

Similarly, we reject the Court of Appeals's and Southern Crescent's assertions that a change from a prior version of the CON statute indicates that the current OCGA § 31-6-40 (a) is not exhaustive. Specifically, they point to prior versions of the CON statute, see Ga. Code Ann. § 88-3302 (s) (1979); OCGA § 31-6-2 (14) (1983) — provisions that were updated and re-codified in 2008 as OCGA § 31-6-40 (a) — which provided that "'new institutional health service' *means*," followed by six specific acts or services, see id. (emphasis supplied), as compared to OCGA § 31-6-40 (a), which uses "include" instead of "means" and introduces a list of seven (now eight) specific acts or services, arguing that "means" is exclusive whereas "include" is not. According to this logic, the change in wording from "means" to "include" indicates the General Assembly's intent for OCGA § 31-6-40 (a) to represent an illustrative list of examples for which a CON is required. See *UHS of Anchor*, 351 Ga. App. at 44. We are not persuaded. But especially given that even

Southern Crescent acknowledges that the list of new institutional health services for which a CON is required was comprised of a list of six specific acts or services before 1983, was comprised of a seven-item list during the period of time relevant to this case, and is currently comprised of eight specific acts or services, we cannot say that the prior use of "means" to introduce that multi-item enumerated list is a distinction with any real difference.

(d) *Statutory history indicates that OCGA § 31-6-40 (a) sets forth an exhaustive list that does not include bed redistribution as a new institutional health service for which a CON is required.*

We have also considered the history of a statute's enactment and amendments in evaluating the meaning of that statute. See, e.g., *GeorgiaCarry.Org, Inc. v. Atlanta Botanical Garden, Inc.*, 306 Ga. 829, 835-836 (834 SE2d 27) (2019); *Jones v. Peach Trader Inc.*, 302 Ga. 504, 512-516 (807 SE2d 840) (2017). Looking to the statutory history here, the pre-1983 version of the CON statute included in the enumerated list of new institutional health services requiring CON approval "[a] change in bed capacity of a health care

facility which increases the total number of beds *or which redistributes beds among various categories.*"  Ga. Code Ann. § 88-3302 (s) (1979) (emphasis supplied).   The General Assembly removed the italicized language from the CON statute by amendment in 1983, thus eliminating any reference to bed "redistribut[ion]" requiring CON approval.  See OCGA § 31-6-2 (14) (1983); Ga. L. 1983, pp. 1566, 1571, § 1.  And the absence of language pertaining to bed redistribution, which is still reflected in the version of OCGA § 31-6-40 at issue in this case, reinforces our conclusion that the General Assembly does not require CON approval for bed reconfiguration under these circumstances.  See *Transp. Ins. Co. v. El Chico Rests., Inc.*, 271 Ga. 774, 776 (524 SE2d 486) (1999) (presuming that the legislature's removal of limiting language from a law demonstrated a "considered choice" to remove such limits).  That is especially so where, as here, the General Assembly has amended the definition of "new institutional health service" multiple times since 1983, see, e.g., Ga. L. 2008, pp. 12, 13, § 1-1 (eff. July 1, 2008); Ga. L. 2019, pp. 148, 152, § 1-4 (eff. July 1,

2019), but has never restored the phrase "or which redistributes

beds" or anything similar to that definition.[15]  Cf. *Wetzel*, 298 Ga. at

35 ("The final indicator of the statute's meaning comes from the fact

that the General Assembly chose to retain (with technologically

updated language) the 'operating a computer bulletin board' phrase

---

[15] Citing dicta from *Albany Surgical, P.C. v. Ga. Dept. of Community Health*, 278 Ga. 366, 368 (602 SE2d 648) (2004), Southern Crescent argues that the General Assembly acquiesced to the Psychiatric Rule when the Rule was submitted to legislative counsel pursuant to OCGA § 31-6-21.1 (b) and the General Assembly did not object to it.  See OCGA § 31-6-21.1 (b) (providing that "[t]he department shall transmit" copies of a rule notice "to the legislative counsel," which "the legislative counsel shall furnish [to] the presiding officer of each house" of the General Assembly and "to each member of the Health and Human Services Committee[s]" of the Senate and House of Representatives). Southern Crescent specifically contends that "when the legislature did not object to the Psychiatric Rule, it expressed intent that the Psychiatric Rule is consistent with the CON Statute."

But putting aside the serious doubts some of us harbor about that case, we have never held that presenting a notice of a proposed rule to two legislative committees and two other legislators (let alone to legislative counsel) can serve as an adequate substitute for the distinct lawmaking roles played by the Georgia House of Representatives, the Georgia Senate, and the Georgia Governor, or for the role of the Judiciary in determining a rule's legality.  See *Roach*, 265 Ga. at 502 (distinguishing the General Assembly's power to pass a law from an administrative agency's limited power to effectuate that law); *Stephenson*, 269 Ga. at 543 (describing the promulgation of a rule that conflicts with the controlling statute as an "unconstitutional usurpation of the General Assembly's power").  We, unlike the Court of Appeals, see *UHS of Anchor*, 351 Ga. App. at 48, reject Southern Crescent's argument.

when OCGA § 16-12-100.1 was amended in 2013.").[16]  Indeed, allowing the Department to add by *administrative rule* a category of new institutional health service that requires *statutory* CON authority where the General Assembly expressly removed that very same category from the statute would raise serious questions about the constitutionality of the Department's rulemaking authority.

(e) *The constitutional doubt canon further weighs in favor of interpreting "include" as introducting an exhaustive list as it is used in OCGA §31-6-40 (a).*

We have concluded that there are strong textual and contextual indicators that the term "include," as used in OCGA § 31-

---

[16] Southern Crescent also argues that the Psychiatric Rule is consistent with exemptions found elsewhere in the CON statute that alleviate the need for CON approval under certain circumstances but nonetheless require a CON for bed redistribution.  See, e.g., OCGA §§ 31-6-47 (a) (26) (B) (i) (III) (exempting from CON requirements capital expenditures to remodel, renovate, or replace a medical-surgical hospital if the project "[d]oes not result in . . . [a]ny redistribution of existing beds among existing clinical health services") (added in 1989); 31-6-47 (a) (27) (C) (exempting from CON requirements "[t]he renovation, remodeling, refurbishment, or upgrading of a health care facility, so long as the project does not result in . . . [a]ny redistribution of existing beds among existing clinical health services") (added in 2019).  But those provisions actually undermine, rather than support, Southern Crescent's argument because they, unlike OCGA § 31-6-40 (a), expressly enumerate bed redistribution as a specific circumstance that would require CON approval.

6-40 (a), serves as a limiting term that introduces an exhaustive list of new institutional health services for which a CON is required, and that the statutory history of OCGA § 31-6-40 (a) supports that interpretation. But to the extent there is any remaining doubt about our analysis, we may also consider additional canons of construction to assist our statutory interpretation. Here, we look to the canon of constitutional doubt to aid our analysis.

Under the canon of constitutional doubt, "if a statute is susceptible of more than one meaning, one of which is constitutional and the other not, we interpret the statute as being consistent with the Constitution." *S & S Towing & Recovery, Ltd. v. Charnota*, 309 Ga. 117, 119 (844 SE2d 730) (2020) (punctuation omitted) (quoting *Cobb County School Dist. v. Barker*, 271 Ga. 35, 37 (518 SE2d 126) (1999)). Cf. *Crowder v. State of Ga.*, 309 Ga. 66, 73 n.8 (844 SE2d 806) (2020) (noting that although "[i]n some cases, the canon of constitutional avoidance allows courts to choose between competing plausible interpretations of a statutory text, resting on the reasonable presumption that the legislature did not intend the

alternative which raises serious constitutional doubts," that canon cannot be relied upon to avoid a "potential constitutional issue" when "we can identify only one plausible interpretation of [a] statute").

To that end, the canon of constitutional doubt "militates against not only those interpretations that would render the statute unconstitutional, but also those that would even raise serious questions of constitutionality." Scalia & Garner, supra, at 247-248 (citation omitted). See also *Haley v. State*, 289 Ga. 515, 521-522 (712 SE2d 838) (2011) ("But even if this were only a *reasonable* narrowing construction of the statute, we would adopt it to avoid the serious constitutional concerns raised by the broader construction discussed above.") (emphasis in original); *Stone v. Stone*, 297 Ga. 451, 454-455 (774 SE2d 681) (2015) ("Statutes should be interpreted to avoid serious constitutional concerns where such an interpretation is reasonable."). And because one of the two potentially plausible interpretations here — that "include" is a limiting term that sets out an exhaustive list of statutorily defined new institutional health

services requiring a CON — also avoids an interpretation of OCGA § 31-6-21 that could raise serious questions about the constitutionality of the General Assembly's delegation of rulemaking authority to the Department, the canon of constitutional doubt tips the balance of our statutory analysis in favor of that interpretation.

(f) *Serious questions about the non-delegation doctrine being violated counsel in favor of OCGA § 31-6-40 (a) being construed as an exclusive list of new institutional health services for which a CON is required.*

The constitutional non-delegation doctrine is "rooted in the principle of separation of powers"[17] and "mandates that the General Assembly not divest itself of the legislative power granted to it by Art. III, Sec. I, Par. I, of our Constitution" by delegating legislative

---

[17] The Georgia Constitution, unlike the United States Constitution, contains an express provision requiring the separation of powers. See Ga. Const. of 1983, Art. I, Sec. II, Par. III ("The legislative, judicial, and executive powers shall forever remain separate and distinct; and no person discharging the duties of one shall at the same time exercise the functions of either of the others except as herein provided.").

powers to (for example) executive agencies. *Dept. of Transp. v. City of Atlanta*, 260 Ga. 699, 703 (398 SE2d 567) (1990) (delegation of authority to state commission not improper and did not violate separation of powers where the General Assembly provided guidance in the form of directing the Commission to consider whether proposed eminent domain action was "more in the public interest").[18] See Ga. Const. of 1983, Art. III, Sec. I, Par. I ("The legislative power of the state shall be vested in a General Assembly which shall consist of a Senate and a House of Representatives."). We have recognized, however, that the General Assembly's "delegation of legislative authority is permissible when it is accompanied by *sufficient guidelines* for the delegatee." *Pitts v. State*, 293 Ga. 511, 517 (748 SE2d 426) (2013) (citing *Dept. of Transp.*, 260 Ga. at 703) (emphasis supplied). Over the years, we have upheld delegations of legislative authority when such guidance has been provided, because under those circumstances, "the delegatee is not performing a legislative function, that is, it is not

---

[18] Some of us have doubts about whether this case was rightly decided.

making a purely legislative decision, but is acting in an administrative capacity by direction of the legislature." Id. (rejecting defendant's claim that a statute improperly delegated legislative authority and violated separation of powers where the General Assembly provided "*realistic guidance*" for enforcement of the statute at issue) (emphasis supplied). In upholding the General Assembly's delegations of authority, we have also looked to the number and type of conditions the General Assembly has imposed on a delegatee to guide its exercise of authority and the mandatory consideration a delegatee must give to the General Assembly's statutory guidance. See, e.g., *State v. Moore*, 259 Ga. 139, 142 (376 SE2d 877) (1989) (General Assembly's delegation of authority to Department of Transportation not unconstitutional where statute established statutory length limits and exemptions for oversized vehicles but delegated authority to the Department to "designate any other street, road, or highway for oversized vehicles 'to provide reasonable access requirements'" and imposed "*mandatory consideration of guidelines*" on the Department) (citation omitted;

emphasis supplied); *Button Gwinnett Landfill, Inc. v. Gwinnett County*, 256 Ga. 818, 819 (353 SE2d 328) (1987) (delegation was not unconstitutional where ordinance required *15 conditions* to be met as part of a delegation of power to a zoning board).

By contrast, we have held that statutes delegating legislative authority violate constitutional non-delegation and separation of powers where, for example, the General Assembly fails to establish guidelines for the delegatee's exercise of authority, or where it delegates such broad discretion that an agency is permitted to decide what violates a law passed by the General Assembly. See, e.g., *Ga. Franchise Practices Comm. v. Massey-Ferguson, Inc.*, 244 Ga. 800, 802 (262 SE2d 106) (1979) (portions of Franchise Practices Act unconstitutional because they "unlawfully delegate[d] legislative responsibility" by granting an agency "broad discretion" and "the power to define instances in which the Act will apply but *fail[ed] to set up guidelines* for making these determinations") (emphasis supplied), superseded by Ga. Const. of 1983, Art. III, Sec. VI, Par. II (c); *Howell v. State*, 238 Ga. 95, 95-96 (230 SE2d 853) (1976) (portion

of statute providing that "[a]ny person or corporation who shall violate any of the rules or regulations promulgated by the commission shall be guilty of a misdemeanor" was an unconstitutional delegation of legislative authority because it authorized the agency "to *decide what shall and what shall not be an infringement of the law"*) (citation and punctuation omitted; emphasis supplied).

Importantly, we need not decide today how much statutory guidance must accompany a delegation of legislative authority, or how specific that guidance must be, to ensure that it does not violate the separation of powers requirement enshrined in Georgia's Constitution.[19] For purposes of our constitutional-doubt analysis,

---

[19] Notably, however, rather than pointing to "sufficient guidelines" or standards that guide the Department's delegated authority to promulgate rules under these circumstances, see *Pitts*, 293 Ga. at 517; *Dept. of Transp.*, 260 Ga. at 702, Southern Crescent instead argues that the Department has *broad* authority to "adopt, promulgate, and implement rules and regulations sufficient to administer . . . the certificate of need program," see OCGA § 31-6-21 (b) (4), particularly to "establish, by rule, need methodologies for new institutional health services and health care facilities," including for psychiatric and substance-abuse inpatient programs, see id. at (b) (8), and that "[t]his broad delegation is consistent with the CON Statute's enumerated purposes," set forth in OCGA § 31-6-1.

we need only identify "serious constitutional concerns raised by [a] broader construction" to reach the conclusion that a narrower statutory construction is required, see *Haley*, 289 Ga. at 521-522, and we have identified such concerns here.

In reaching that conclusion, we rely principally on two cases from this Court in which we evaluated claims that a delegation of legislative authority violated the non-delegation doctrine in the context of the statutory CON scheme at issue in this case and concluded that it did. Twenty-five years ago, in *HCA Health Svcs. of Ga., Inc. v. Roach*, 265 Ga. 501 (458 SE2d 118) (1995), this Court examined an agency rule that authorized a health care facility's relocation without any CON approval under OCGA § 31-6-40 (a)'s

---

But the guidance the General Assembly provided the Department in OCGA § 31-6-21 (a) (8), which provides a number of factors the Department must consider in developing methodologies, does not provide the guidance necessary for the Psychiatric Rule to avoid non-delegation concerns. That is because it *presumes* that a need methodology will be established for a new institutional health service, which in turn requires a CON — yet the very question we are faced with today is whether the Department can *add* a category of new institutional health service — i.e., the type of bed redistribution described above—to the list of new institutional health services the General Assembly has established by statute.

statutory predecessor, identified non-delegation concerns pertaining to the General Assembly's delegation of rulemaking authority to the Department's predecessor agency, and applied the constitutional doubt canon to invalidate the rule. See *Roach*, 265 Ga. at 502-503. There, the agency contended that a provision of former OCGA § 31-6-47[20] authorized it to promulgate a rule that had the effect of adding to a statutory list of exemptions from CON approval "the relocation of a health care facility anywhere within three miles" of its existing location, even though such relocation was not included in the multiple exemptions the General Assembly had already provided by statute. Id. at 501. Reasoning that the agency's authority "extend[ed] only to the performance of [an] administrative function" to "promulgate rules for the enforcement of the General Assembly's enactments," we emphasized that the agency had "no constitutional

---

[20] That portion of the statute (which has been carried over nearly verbatim in current OCGA § 31-6-47 (b)) provided that the agency "shall establish a procedure for expediting or waiving reviews of certain projects the nonreview of which it deems compatible with the purposes of this chapter[.]" *Roach*, 265 Ga. at 502 (punctuation omitted) (quoting OCGA § 31-6-47 (c) (1991)).

authority to legislate" and concluded that under the agency's interpretation of the statute, it "would have complete and unbridled authority to determine what health care facilities are subject to" CON requirements "since it would have the power to exempt . . . any facility which the General Assembly had left unexempted," so long as it was "deem[ed] compatible with the purposes of" the CON statute.  Id. at 502-503 (citation and punctuation omitted). Relying on the constitutional doubt canon, we rejected the agency's proposed interpretation, holding that such a construction "would render that statutory provision an unconstitutional delegation . . . of . . . legislative power," and held that the agency's relocation rule was invalid.  See id.[21]

Then, in *North Fulton Med. Center v. Stephenson*, 269 Ga. 540, 543 (501 SE2d 798) (1998), we invalidated another rule the

---

[21] Similarly, the United States Supreme Court has applied the federal non-delegation doctrine to narrowly construe statutory delegations of agency authority.  See *Mistretta v. United States*, 488 U.S. 361, 373 n.7 (109 SCt 647, 102 LE2d 714) (1989) ("In recent years, our application of the nondelegation doctrine principally has been limited to the interpretation of statutory texts, and, more particularly, to giving narrow constructions to statutory delegations that might otherwise be thought to be unconstitutional.").

Department's predecessor promulgated, this time exempting from CON requirements "relocating ambulatory surgical or obstetrical facilities." Id. at 544. As in *Roach*, we underscored the "clear distinction between the General Assembly's constitutional power to enact legislation governing the CON program [and the agency's] limited authority to promulgate rules to effectuate that legislation," which did "not authorize [the agency] to establish a separate class of health care facilities and then exempt that class from the Code's requirements." Id. at 543-544. In invalidating the rule, we again referenced the agency's "complete and unbridled authority" to determine exemptions from statutory requirements and concluded that it was an "unconstitutional usurpation of the General Assembly's power to define the thing to which the statute . . . is to be applied." Id. at 543 (citation and punctuation omitted).

Flint River contends that under the logic of *Roach* and *Stephenson*, the Psychiatric Rule is invalid because it adds to OCGA § 31-6-40 (a), by administrative rule, a new category of "new institutional health service" for which CON approval is required —

i.e., the reallocation of beds without exceeding a facility's authorized total bed capacity — when the General Assembly did not include that category as one of the (then) seven items in the statutory enumerated list, and when the statutory history demonstrates that the General Assembly in fact *removed* redistribution of beds from the statutory requirement of CON approval.

We agree that the Psychiatric Rule, as the Department initially attempted to apply it here, raises serious doubts about the constitutionality of the General Assembly's delegation of authority. Specifically, we agree that an expansive interpretation of OCGA § 31-6-40 (a) very well may violate the non-delegation doctrine. Indeed, just as the Department's predecessor agency attempted to add to a statutory list of exemptions from CON approval a category of health care facility for which the CON statute did not provide an exemption, see *Stephenson*, 269 Ga. at 543-544; *Roach*, 265 Ga. at 502-503,[22] the Department, through the Psychiatric Rule, attempted

---

[22] In upholding the Department's authority to promulgate the Rule, the Court of Appeals attempted to distinguish *Roach* and *Stephenson* on the basis

to add to an already established statutory list an additional category of new institutional health service for which CON approval is required. But interpreting the Department's delegated authority so expansively would amount to the same type of "complete and unbridled authority" we characterized as an "unconstitutional usurpation of the General Assembly's power" in *Stephenson*, 269 Ga. at 543.[23]

We thus conclude that if the Department were authorized to expand through rulemaking the statutory definition of "new institutional health service" requiring CON approval set forth in OCGA § 31-6-40 (a), sufficient doubt would be raised about the constitutionality of the type and amount of authority delegated to

---

that the agency in those cases attempted to create *exemptions* to statutory requirements via rule, whereas the Department's efforts here were focused on promulgating a rule that helped enforce statutory CON *approval* requirements. See *UHS of Anchor*, 351 Ga. App. at 46-47. But we are not persuaded; there is no legal distinction between the agency's usurpation of legislative authority by effectively adding an exemption to a statute in *Roach* and in *Stephenson*, and the Department's usurpation by effectively adding a service requiring CON approval here.

[23] Indeed, the Department itself now disclaims such a reading of the Psychiatric Rule. See footnote 4, above.

the Department under OCGA § 31-6-21 in this context that we should avoid such an interpretation. And although we conclude that the canon of constitutional doubt therefore weighs in favor of interpreting OCGA § 31-6-40 (a) narrowly, we also emphasize that we are not required to determine whether any particular statute actually violates non-delegation or separation of powers to reach that conclusion.[24]

---

[24] That this Court has already suggested that OCGA § 31-6-40 (a) may be pressing the outer limits of the General Assembly's constitutional authority to regulate the healthcare industry further supports our conclusion. In *Women's Surgical Center, LLC v. Berry*, 302 Ga. 349 (806 SE2d 606) (2017), which upheld OCGA § 31-6-40 (a) (7) against, among other things, a substantive due process challenge under rational basis review, we "emphasize[d] that this is a case about the General Assembly's ability to regulate healthcare. The record in this case makes quite clear that the market for healthcare is not normal; indeed, there are few (if any) other private sector markets so dominated by government regulation." Id. at 355 n.7. And we opined that "[n]othing in today's opinion should be understood to support sweeping economic regulation of this sort beyond this unique context." Id. at 356 n.7; see also *Solid Waste Agency of Northern Cook County v. United States Army Corps of Engineers*, 531 U.S. 159, 172-174 (121 SCt 675, 148 LE2d 576) (2001) ("Where an administrative interpretation of a statute invokes the outer limits of Congress' power, we expect a clear indication that Congress intended that result. . . . We thus read the statute as written to avoid the significant constitutional and federalism questions raised by [the agency's] interpretation, and therefore reject the request for administrative deference.").

(g) *OCGA § 31-6-41 (a)'s "scope" provision does not enable expansion of the enumerated list of new institutional health services requiring CON approval under OCGA § 31-6-40 (a).*

Finally, Southern Crescent contends that the Psychiatric Rule is valid and requires Flint River to obtain a CON to redistribute beds for psychiatric/substance-abuse patients because the Rule is "necessitated" by OCGA § 31-6-41 (a), which provides that "[a] certificate of need shall be valid only for the defined scope, location, cost, service area, and person named in an application, as it may be amended, and as such scope, location, service area, cost, and person are approved by the department[.]"  OCGA § 31-6-41 (a).

Specifically, Southern Crescent argues that if a hospital exceeds the number of psychiatric beds its CON authorizes, then the hospital has exceeded the "scope" of the CON the Department approved.  See OCGA § 31-6-41 (a).  According to Southern Crescent, that is because the Rule harmonizes OCGA § 31-6-40, which "prescribes when a CON is needed," and OCGA § 31-6-41 (a), which "limits a CON to its defined scope."  The Court of Appeals agreed,

reasoning that "the Department saw fit to require by its Rules that the expansion of an existing psychiatric and/or substance abuse facility requires a CON," and that "[t]his rule is consistent with the statutory specification that CONs are 'valid *only for* the defined scope . . . approved by the department.'" *UHS of Anchor*, 351 Ga. App. at 43 (emphasis in original) (quoting OCGA § 31-6-41 (a)).

We disagree. Flint River has more than one CON: one authorizes it to operate "as a general acute care hospital for 49 inpatient beds," and another specifically authorizes 12 psychiatric inpatient beds. It is undisputed that Flint River has not exceeded the number of inpatient beds allocated to it by the 49-bed CON; at issue is only whether its reallocation of psychiatric inpatient beds *within* the total number of inpatient beds it is authorized to operate requires its own CON. Southern Crescent fervently contends that it does, arguing that "before a psychiatric healthcare facility can exceed its number of CON-authorized beds, it needs a new CON." But that argument ignores that OCGA § 31-6-40 (a), not OCGA § 31-6-41 (a), governs which services constitute a new institutional

health service that requires a CON, and — as we determined above — the reallocation of beds is not one of them.[25] In other words, OCGA § 31-6-41 (a) — a statute through which the General Assembly has generally ensured that Department-approved CONs are limited in scope — does not alter the text of OCGA § 31-6-40 (a), a statute through which the General Assembly has specified an exhaustive list of new institutional health services for which a CON is required. See *State v. Hamilton*, 308 Ga. 116, 124 (839 SE2d 560) (2020) (noting that typically, more general statutory provisions do not override more specific ones). Rather, OCGA § 31-6-41 (a) ensures that new institutional health services that *do* require CON approval, as required by OCGA § 31-6-40 (a), do not then exceed the scopes of the CONs as they are approved by the Department. Thus, to the extent the Psychiatric Rule purports to require a separate CON for bed redistribution within an existing CON-approved

---

[25] In its final order in the administrative proceedings, the Department concluded that it "disagree[d] with the Hearing Officer's interpretation that the reconfiguration of [Flint River's] beds within existing licensed capacity by [Flint River] is governed by OCGA § 31-6-41 (a)."

psychiatric/substance-abuse program without exceeding the total number of approved inpatient beds for the facility, the Rule is invalid because it purports to create a new category of new institutional health service that is not enumerated in OCGA § 31-6-40 (a).

4.   *Conclusion.*

Based on the foregoing analysis, we hold that OCGA § 31-6-40 (a) provides an exhaustive list of new institutional health services for which a CON is required.  The General Assembly's delegation of legislative authority to the Department to promulgate rules as part of its administration of the CON program does not include the authority to define additional new institutional health services requiring a CON, beyond those listed in OCGA § 31-6-40 (a).  To the extent the Psychiatric Rule purports to require a new CON for redistribution of psychiatric/substance-abuse beds in a facility that has already secured CON approval to operate a psychiatric/substance-abuse inpatient program and the total number of inpatient beds under the facility's broader CON is not

exceeded, the Rule exceeds the Department's rulemaking authority and is therefore invalid. We therefore reverse the Court of Appeals's opinion holding otherwise.

*Judgment reversed. All the Justices concur, except Nahmias, P. J., and McMillian, J., who join in full except for Division 3 (e) and 3 (f), Blackwell, J., not participating, and Bethel and Ellington, JJ., disqualified.*

NAHMIAS, Presiding Justice, concurring specially in part.

I concur in the judgment and in the majority opinion except for its Division 3 (e) and (f). I do not agree with everything that the opinion says about the "non-delegation doctrine," and more importantly, I see no need to say anything at all about that constitutional question to decide the statutory interpretation issue before us. As the remainder of the majority opinion persuasively demonstrates, the text, context, and history of OCGA § 31-6-40 (a) make it clear that this statutory provision's long and diverse list of "new institutional health services" for which a CON is required is exclusive, so the Psychiatric Rule could not add "bed redistribution"

to that list. There is no other plausible interpretation of the statute, and thus there is no need for the Court to wade into the murky waters of the non-delegation doctrine seeking to find a "constitutional doubt" to clarify what is already clear.

I am authorized to state that Justice McMillian joins in this concurrence.

Decided October 5, 2020.

*Balch & Bingham, Christopher S. Anulewicz, Austin B. Alexander*, for appellant.
*Morris, Manning & Martin, Robert C. Threlkeld, Ryan C. Burke*, for appellee.
*Stacey A. Hillock, Roxana D. Tatman, Rachel L. King, Marial L. Ellis, Christopher M. Carr, Attorney General, Margaret K. Eckrote, Deputy Attorney General, Daniel S. Walsh, Senior Assistant Attorney General, Cathelynn Tio, Assistant Atttorney General, Andrew A. Pinson, Solicitor-General,* amici curiae for Department of Community Health.
 *Parker, Hudson, Ranier & Dobbs, Armando L. Bassarrate II, David B. Darden; Moore, Ingram, Johnson & Steele, Robert D. Ingram, David P. Conley; Taylor English Duma, Frank B. Strickland*, amici curiae for Georgia Alliance of Community Hospitals.
*Holland & Knight, Robert S. Holismith, Jr., James C. Evans; Jessica L. Thompson*, amici curiae.