**FIRST DIVISION**
**BARNES, P. J.,**
**BROWN and HODGES, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**June 29, 2022**

# In the Court of Appeals of Georgia

A22A0111. EMORY UNIVERSITY d/b/a EMORY UNIVERSITY
    HOSPITAL SMYRNA et al. v. KENNESTONE HOSPITAL,
    INC. d/b/a WELLSTAR WINDY HILL HOSPITAL.

A22A0112. GEORGIA DEPARTMENT OF COMMUNITY
    HEALTH v. KENNESTONE HOSPITAL, INC. d/b/a
    WELLSTAR WINDY HILL HOSPITAL.

HODGES, Judge.

In this appeal, we are asked to determine whether an authorized long-term care hospital may convert its beds and available services to operate as a short-stay general acute care hospital without first obtaining a new certificate of need ("CON"). See OCGA § 31-6-40 et seq. In 2019, Kennestone Hospital, Inc. d/b/a WellStar Windy Hill Hospital ("WellStar") sought confirmation from the Georgia Department of Community Health ("the DCH") that its long-term care hospital beds at its Windy Hill Hospital facility "would revert to their previous status as . . . short-stay acute care

beds" without obtaining a CON once the facility relinquished its Medicare long-term care hospital certification. Emory University d/b/a Emory University Hospital Smyrna and Saint Joseph's Hospital of Atlanta, Inc. d/b/a Emory Saint Joseph's Hospital (collectively, "Emory") objected to WellStar's proposal, arguing that WellStar sought to create a new short-stay acute care general hospital, which required prior CON authorization. The DCH agreed with Emory, finding that WellStar had operated as a long-term care hospital since 1996 and, as a result, had obtained various CONs during that span which did not involve short-stay hospital beds. Thus, the DCH determined that WellStar's proposed transition of Windy Hill Hospital to a 115-bed short-stay hospital constituted a "new institutional health service," which required CON approval. See OCGA § 31-6-40 (a).

WellStar appealed to the CON Appeal Panel, and a hearing officer affirmed the DCH's decision. WellStar next appealed to the DCH commissioner, who affirmed the hearing officer. However, the Superior Court of Cobb County granted WellStar's petition for judicial review and reversed the DCH commissioner's decision, finding that WellStar "is entitled to revert its beds to their previous short-stay status without prior CON review and approval."

2

We granted Emory and the DCH's applications for discretionary appeal, and now conclude that, based upon the plain language of OCGA § 31-6-40 et seq., Ga. Comp. R. & Regs. r. 111-2-2-.20 (1) (d) and 111-2-2-.36 (2) (d), WellStar's proposed conversion of its long-term care hospital beds to short-term acute care hospital beds requires a new CON. Therefore, we reverse the superior court's judgment granting WellStar's petition for judicial review in Case No. A22A0111 and dismiss Case No. A22A0112, filed by the DCH, as moot.

1. At the outset, we determine "whether 'substantial evidence' supports the agency's findings of fact[.]" *Palmyra Park Hosp. v. Phoebe Sumter Med. Center*, 310 Ga. App. 487, 488 (714 SE2d 71) (2011). In this case, the operative facts are undisputed.[1] So viewed, the record demonstrates that WellStar Windy Hill Hospital ("Windy Hill") opened in 1973 as a general acute care short-stay hospital before Georgia enacted its CON program.[2] See OCGA § 31-6-40 et seq. In 1983, Windy Hill

---

[1] The parties executed a "Joint Stipulation of Undisputed Facts" during WellStar's appeal before the CON Appeal Panel. The hearing officer included the facts in the officer's order affirming the DCH's initial agency decision and noted that the parties "agree that there are no contested issues of fact[,]" and the DCH commissioner specifically incorporated the stipulation in his final order affirming the panel decision.

[2] The CON Program became effective in 1979. See Ga. Code Ann. §§ 88-3301, 88-3306 (a) (1983). "The CON [P]rogram establishes a comprehensive system of

3

reduced its short-stay bed capacity from 165 to 115. In 1996, WellStar contacted the State Health Planning Agency ("the SHPA"), the predecessor agency to the DCH, inquiring whether a CON to convert Windy Hill from a short-stay general acute care hospital to a long-term care hospital would be required. In addition to providing long-term care, WellStar represented that it would provide outpatient surgical services and convert the emergency room into a minor emergency, or immediate care, facility.

Based on WellStar's representations, the SHPA issued a determination letter stating that WellStar would "not need to obtain CON approval in order to implement its proposal" because the operation of Windy Hill "as a long-term acute care hospital is within the original scope of Windy Hill's CON authorization as a general acute care hospital." Thereafter, Windy Hill surrendered its original permit, which had authorized Windy Hill to operate as a "General Hospital," and the SHPA marked the permit as "Void." WellStar obtained a new permit in 1997 authorizing it to operate as a "Specialized Long Term Acute Care Hospital," and it began operating as a long-term care hospital. Windy Hill initially had 42 beds, but in 2007, WellStar obtained

planning for the orderly development of adequate health care services throughout the state." *Palmyra Park Hosp.*, 310 Ga. App. at 488.

a new CON to renovate the hospital in order to add 5 additional beds.[3] Thereafter, although WellStar only operated 47 beds at Windy Hill, the hospital retained a licensed bed capacity of 115 beds.

In 2019, WellStar sought a determination from the DCH that its complement of 115 long-term beds would revert to short-stay beds without going through CON approval, and that it would then have authorization to operate as a short-stay general acute care hospital, if it relinquished its Medicare long-term care hospital certification. In support of its application, WellStar cited Ga. Comp. R. & Regs. r. 111-2-2-.20 (1) (d) and 111-2-2-.36 (2) (d), which allow for the automatic conversion, or reversion, of certain long-term beds to short-stay beds for hospitals that have been approved through the CON process.

Emory objected to WellStar's proposal, arguing that WellStar sought to create a new short-stay hospital, which constituted a "new institutional health service" and required prior CON approval. In its initial agency determination, the DCH agreed

---

[3] Importantly, the distinction between short-stay acute care general hospitals and long-term care hospitals, which is discussed in greater detail infra, was highlighted by the promulgation of Ga. Comp. R. & Regs. r. 111-2-2-.20 ("Specific Review Considerations for Short-stay General Hospital Beds") and 111-2-2-.36 ("Specific Review Considerations for Long Term Care Hospitals"), each of which became effective in 2005.

5

with Emory, finding that WellStar had operated as a long-term care facility since 1996 and, as such, had obtained various CONs which did not involve short-stay hospital beds. In addition, the DCH's determination noted that the SHPA determined in 1996 "that Windy Hill's operating as a [long-term care hospital] was not subject to prior CON review and approval." Thus, the DCH determined that WellStar's proposed transition to a 115-bed short-stay hospital constituted a new institutional health service, which required CON review and approval.

WellStar appealed the DCH's initial decision to the CON Appeal Panel, and a hearing officer affirmed the agency's decision. The hearing officer, citing Ga. Comp. R. & Regs. r. 111-2-2-.20 (1) (d) and 111-2-2-.36 (2) (d), upon which WellStar also relied, rejected WellStar's argument that it was "an existing general acute care hospital that was approved through the CON process to operate as a [long-term care hospital.]" The hearing officer concluded that WellStar had not gone through the CON process in converting to a long-term care hospital, instead finding that "Windy Hill permissibly avoided rather than underwent, much less was 'approved through,' a CON process." The hearing officer also determined that Windy Hill had not "offered inpatient short-stay acute care services since it converted to a [long-term care hospital] . . . 23 years ago" and that "[o]perating a short-stay acute

6

care facility offering such services where none were offered on a regular basis within the previous 12 months would make it a 'new institutional health service'" that required CON review and approval. Finally, the hearing officer rejected WellStar's argument that refusing to allow Windy Hill to convert its beds into short-stay acute care beds violated equal protection by treating it differently than other long-term care hospitals that could revert beds to short-term care beds. WellStar appealed to the DCH commissioner, who affirmed the hearing officer. The commissioner concluded that Windy Hill's proposed conversion "would result in the offering of a reviewable new health service" that required CON review and approval, and that accepting WellStar's argument "would result in a hospital's being able to flip back and forth[,]" thereby undermining the purpose of the CON program.

WellStar then petitioned for judicial review in the superior court. Following a hearing, the superior court reversed the DCH commissioner's decision, concluding that: (1) WellStar was entitled to automatically revert its beds from long-term care to short-stay beds under Ga. Comp. R. & Regs. r. 111-2-2-.20 (1) (d) and 11-2-2-.36 (2) (d) because the 1996 letter from SHPA acknowledging WellStar's right to change from a short-stay hospital to a long-term care hospital constituted a determination under the "CON process" referenced in the Rules; (2) WellStar was not offering a

7

new institutional health service requiring compliance with the CON procedure; and (3) WellStar was authorized to operate either short-stay or long-term beds, and to take away one of those vested rights would be unconstitutional. From that order, we granted Emory and the DCH's applications for discretionary appeal. We consider each appeal in turn, starting with Emory's appeal.

*No. A22A0111*

2. Considering Emory's fourth enumeration first,[4] Emory contends that the superior court erred in finding that WellStar went through the CON process in 1996 when it converted to a long-term care hospital from a short-stay general acute care hospital and that it could, therefore, take advantage of certain CON reversion procedures. We agree.

(i) *General Principles.* "The CON program, which is administered by the DCH, establishes a system of mandatory review requiring that, before new institutional health services and facilities can be developed, the developer must apply for and receive a CON from the DCH." (Citation and punctuation omitted.) *Cobb Hosp., Inc.*

---

[4] See *Browne & Price, P.A. v. Innovative Equity Corp.*, 361 Ga. App. 521, 523 (1), n. 7 (864 SE2d 686) (2021) ("For convenience of discussion, we have taken the enumerated errors out of the order in which appellant has listed them.") (citation and punctuation omitted).

8

*v. Dept. of Community Health*, 349 Ga. App. 452, 456 (1) (a) (825 SE2d 886) (2019), reversed in part on other grounds, 307 Ga. 578 (837 SE2d 371) (2019); see also OCGA § 31-6-1.[5] The DCH is also authorized to promulgate rules for the administration of the CON program. See OCGA § 31-6-21 (a).

> The legislature cedes this authority to the DCH because the public is better served by having experts in the complexities of health care planning make these decisions. The issues are complicated, and the applicable laws, rules, regulations, and precedents require much study, especially for a decision-maker who is not already familiar with them.

(Citation omitted.) *Cobb Hosp.*, 349 Ga. App. at 456 (1) (a).

As a result, "on appeal to this Court, our duty is not to review whether the record supports the superior court's decision but whether the record supports the final decision of the administrative agency." (Citation and punctuation omitted.) *Ga. Dept.*

---

[5] "The policy of this state and the purposes of this chapter are to ensure access to quality health care services and to ensure that health care services and facilities are developed in an orderly and economical manner and are made available to all citizens and that only those health care services found to be in the public interest shall be provided in this state. To achieve such public policy and purposes, it is essential that appropriate health planning activities be undertaken and implemented and that a system of mandatory review of new institutional health services be provided. Health care services and facilities should be provided in a manner that avoids unnecessary duplication of services, that is cost effective, that provides quality health care services, and that is compatible with the health care needs of the various areas and populations of the state." OCGA § 31-6-1.

9

*of Community Health v. Satilla Health Svcs.*, 266 Ga. App. 880, 885 (1) (c) (598 SE2d 514) (2004). To that end, we may reverse or modify the agency's decision only if the decision is:

> (1) [i]n violation of constitutional or statutory provisions; (2) [i]n excess of the statutory authority of the department; (3) [m]ade upon unlawful procedures; (4) [a]ffected by other error of law; (5) [n]ot supported by substantial evidence, which shall mean that the record does not contain such relevant evidence as a reasonable mind might accept as adequate to support such findings, inferences, conclusions, or decisions, which such evidentiary standard shall be in excess of the "any evidence" standard contained in other statutory provisions; or (6) [a]rbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

OCGA § 31-6-44.1 (a).

(ii) *Analysis*. For the following reasons, we conclude that the plain language of the relevant rules and statutes confirms that Windy Hill is not "a hospital that has been *approved through the certificate of need process. . . .*"

In its initial determination letter, the DCH broadly stated that "Windy Hill's [Long-Term Acute Care] Beds Were not Approved through the CON Process." The CON Appeal Panel hearing officer agreed, finding that Windy Hill "permissibly avoided rather than underwent, much less was 'approved through,' a CON process"

in 1996. As a result, the hearing officer concluded that Windy Hill's long-term care hospital beds did not revert to short-stay beds under Ga. Comp. R. & Regs. r. 111-2-2-.20 (1) (d) and 111-2-2-.36 (2) (d) because Windy Hill had not been "approved through a CON process[.]" The DCH commissioner agreed and "reject[ed] Windy Hill's arguments that it is entitled to avail itself of the 'reversion exception.'"

In contrast, the superior court found that WellStar was entitled to have its long-term care hospital beds automatically revert to short-stay beds under Ga. Comp. R. & Regs. r. 111-2-2-.20 (1) (d) and 111-2-2-.36 (2) (d). In support of its judgment, the superior court found that Windy Hill was "approved through the [CON] process" in 1996 when it obtained approval from the DCH to change from a general care hospital to a long-term health facility without obtaining a CON.

(A) *Relevant Rules Applicable to this Case*. At the outset, we note that when examining statutory provisions,

> we apply the fundamental rules of statutory construction that require us to construe the statute according to its terms, to give words their plain and ordinary meaning, and to avoid a construction that makes some language mere surplusage. Thus, a statute should be read according to its natural and most obvious import of the language without resorting to subtle and forced constructions for the purpose of either limiting or extending its operation.

11

(Citation omitted.) *Cobb Hosp.*, 349 Ga. App. at 459 (1) (c) (ii). "Similarly, in construing agency regulations, we employ the basic rules of statutory construction and look to the plain meaning of the regulation to determine its meaning." (Citation and punctuation omitted.) Id. at 459-460 (1) (c) (ii).

> Accordingly,
>
> when an administrative agency decision is the subject of judicial review, judicial deference is to be afforded the agency's interpretation of rules and regulations it has enacted to fulfill the function given it by the legislative branch. And in construing administrative rules, the ultimate criterion is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the rule.

(Citation and punctuation omitted.) *ASMC, LLC v. Northside Hosp.*, 344 Ga. App. 576, 582 (810 SE2d 663) (2018). In short, we "defer to the DCH's decisions regarding policy, as well as to the DCH's interpretation and enforcement of its own rules." (Citations, punctuation, and footnote omitted.) *Cobb Hosp.*, 349 Ga. App. at 460 (1) (c) (ii). This is so because

> agencies provide a high level of expertise and an opportunity for specialization unavailable in the judicial or legislative branches. They are able to use these skills, along with the policy mandate and discretion entrusted to them by the legislature, to make rules and enforce them in

12

fashioning solutions to very complex problems. Thus, their decisions are not to be taken lightly or minimized by the judiciary. Review overbroad in scope would have the effect of substituting the judgment of a judge or jury for that of the agency, thereby nullifying the benefits of legislative delegation to a specialized body.

(Citation and punctuation omitted.) Id. at 460 (1) (c) (ii). "In the context of the DCH, the administration of the CON program requires a particularly high level of expertise and specialization [because] [t]he DCH rules promulgated to administer the program are detailed and lengthy." (Citation and punctuation omitted.) Id. at 460-461 (1) (c) (ii).

(B) "*Certificate of Need Process*." Against this backdrop, we turn to the relevant rules governing, and a basic overview of, the CON process.

(1) Ga. Comp. R. & Regs. r. 111-2-2-.20 (1) (d) provides that

a hospital that has been *approved through the Certificate of Need process* to use a certain number of short-stay hospital beds for long-term acute care ("LTAC") beds shall have such LTAC beds removed from the official inventory of available short-stay beds once the LTAC is certified by Medicare; provided, however, that *such beds will revert to the hospital's official inventory of available short-stay beds at any point that the LTAC ceases operation or is no longer certified by Medicare*.

13

(Emphasis supplied.) Similarly, Ga. Comp. R. & Regs. r. 111-2-2-.36 (2) (d) provides

that a "Long Term Care Hospital, or "LTCH" is:

> a hospital that has been *approved through the Certificate of Need process* to use all of its short-stay beds for a Freestanding LTCH shall have such beds removed from the official inventory of available short-stay beds when the LTCH is certified by Medicare; provided, however, that *the hospital's beds will revert to the official inventory of available short-stay beds at any point that the facility ceases to be certified by Medicare as an LTCH*.

(Emphasis supplied.) Accordingly, these provisions, which the DCH commissioner

and the parties dubbed collectively as the "reversion exceptions," are available only

to those hospitals that have been "approved through the certificate of need process"

to use short-stay hospital beds in a long-term care hospital. Our authorities make clear

that Windy Hill has not been so approved.

(2) We have described the CON process as "a system of mandatory review

requiring that, before new institutional health services and facilities can be developed,

the developer must apply for and receive a CON from the DCH." *ASMC*, 344 Ga.

App. at 577. As part of its evaluation,

> [t]he DCH reviews CON applications and issues decisions granting or denying a CON under statutory considerations in OCGA § 31-6-42 and

14

under general and specific review considerations in rules and regulations promulgated by the DCH as set forth in Ga. Comp. R. & Regs. r. 111-2-1-.01 and 111-2-2-.01 through 111-2-2-.43. Under OCGA § 31-6-42 (a), "[t]he [DCH] shall issue a certificate of need to each applicant whose application is consistent with the [considerations set forth in the statute] and such rules deemed applicable to a project," including the establishment of a need for the services.

(Footnote omitted.) *ASMC*, 344 Ga. App. at 577. And as we have noted,

the administration of the CON program requires a particularly high level of expertise and specialization. The DCH rules promulgated to administer the program are detailed and lengthy. See, e.g., Ga. Comp. R. & Regs. r. 111-2-2-.07, which describes the review procedures for CON applications. *Both the hospital seeking a CON and the hospitals opposing it gather and organize vast amounts of data, expert testimony, and other evidence which are presented to the agency staff, which then interprets and synthesizes the evidence and applies it to the agency rules.* See OCGA § 31-6-43. . . .

Further administrative review is also highly specialized. The hearing officer who reviews the initial DCH staff decision is one of five members of the CON Panel, all of whom are appointed by the Governor and are attorneys "who are familiar with the health care industry but who do not have a financial interest in or represent or have any compensation arrangement with any health care facility." OCGA § 31-6-44 (a), (b).

15

(Citation and punctuation omitted; emphasis supplied.) *Cobb Hosp.*, 349 Ga. App. at

460-461 (1) (c) (ii). Therefore, to enforce Georgia's stated policy directives, the CON

process requires the DCH to thoroughly evaluate a party's CON application to ensure

that "[h]ealth care services and facilities [are] provided in a manner that avoids

unnecessary duplication of services, that is cost effective, that provides quality health

care services, and that is compatible with the health care needs of the various areas

and populations of the state." OCGA § 31-6-1.

At a bare minimum, then, review under the CON process first requires an

application. See OCGA § 31-6-43 (b). Here, the parties have not included a record

citation to, and our review of the record has not revealed, any such application filed

by Windy Hill for its evaluation, as either a short-stay general acute care hospital or

a long-term care hospital, at any point in its history[6] prior to the 2019 application at

issue in this case.[7] And even were we to generously construe WellStar's June 11,

---

[6] As a result, WellStar's argument that it availed itself of the CON process in 1996 is unpersuasive. We further discuss Windy Hill's "grandfathering" in Division 4 infra.

[7] Indeed, the record *does* include at least two prior certificate of need evaluations for Windy Hill — one for a change in ownership of Windy Hill in 1993 and one for the renovation of the third floor of its facility to "to set-up and staff thirteen (13) additional long-term acute care . . . beds. . . ."

16

1996 letter to SHPA in which it sought to operate Windy Hill as a long-term care hospital as an "application," there is no ensuing review in which "[b]oth the hospital seeking a CON and the hospitals opposing it gather and organize vast amounts of data, expert testimony, and other evidence which are presented to the agency staff, which then interprets and synthesizes the evidence and applies it to the agency rules." *Cobb Hosp*., 349 Ga. App. at 461 (1) (c) (ii). To the contrary, SHPA stated in 1996 that Windy Hill need not participate in the CON process at that time. This cursory statement hardly passes as the equivalent of the "detailed and lengthy" review we have outlined above, which would satisfy the plain language requirement that a hospital be "approved through the certificate of need process. . . ."

Moreover, we defer to an agency's interpretation of its rules and regulations *so long as* that interpretation is consistent with the CON statute. See *Medical Center of Central Ga. v. Hosp. Auth. of Monroe County*, 340 Ga. App. 499, 504 (3) (798 SE2d 42) (2017) ("While reviewing courts defer to agency interpretations of the statutes they are charged with administering, that deference applies only as far as the agency interpretation is consistent with the statute.") (citation omitted). In this case, for the reasons outlined above, we conclude that the DCH's "interpretation correctly reflects the plain language of the statute and comports with the legislative intent." Id.

17

(B) *Effect of Lack of Certificate of Need Process*. Because we conclude that Windy Hill has not been "approved through the certificate of need process," it necessarily follows that Windy Hill is not entitled to the benefits of the "reversion exception" in either Ga. Comp. R. & Regs. r. 111-2-2-.20 (1) (d) or 111-2-2-.36 (2) (d). As a result, we conclude that the record supports the DCH commissioner's decision that Windy Hill's proposed conversion from a long-term care hospital to a short-stay general acute care hospital "would require prior CON review and approval." Therefore, in the absence of any basis codified in OCGA § 31-6-44.1 (a), we further conclude that the superior court erred in reversing the DCH commissioner's decision and in finding that "Windy Hill is entitled to automatic reversion of its beds to short-stay status under [Ga. Comp. R. & Regs. r.] 111-2-2-.36 (2) (d)."

3. Next, Emory argues that the superior court erred in finding that a long-term care hospital and a short-stay general acute care hospital are legally the same "clinical health service," see OCGA § 31-6-2 (8), and that a new CON is not required to switch from one category of hospital to the other. In effect, the superior court found that Windy Hill was authorized to operate either a short-stay general acute care hospital or a long-term care hospital under its 1996 authorization. This was error.

18

In its initial determination, the DCH cited OCGA § 31-6-40 (a) (5) and (6) and found that Windy Hill had not "offered inpatient short-stay acute care services since it converted to a [long-term care hospital] . . . 23 years ago" and that, as a result, "Windy Hill's offering of short-stay acute care services where none were offered within the past . . . 12 months constitutes a reviewable new institutional health service." Accordingly, the DCH concluded that Windy Hill's proposed reversion of its long-term care hospital beds to short-stay beds under Ga. Comp. R. & Regs. r. 111-2-2-.20 (1) (d) and 111-2-2-.36 (2) (d) constituted "the development of a new short-stay hospital where one currently does not exist [and] would constitute a reviewable new short-stay hospital and would require prior CON review and approval." On appeal, the hearing officer agreed, noting that it was "undisputed that Windy Hill has not offered inpatient short-stay acute care services since it converted to a [long-term care hospital] . . . 23 years ago" and that "[o]perating a short-stay acute care facility offering such services where none were offered on a regular basis within the previous 12 months would make it a 'new institutional health service'" that required CON review and approval. The DCH commissioner likewise agreed.

The superior court noted that OCGA § 31-6-2 (8) defines "clinical health services" as including "medical-surgical care," but that it does not otherwise

19

distinguish between short-stay and long-term care. The superior court reasoned that, regardless of whether the beds were short-stay or long-term, WellStar offered such medical-surgical care both before and since the 1996 letter. The superior court thus concluded that WellStar was not creating a "new institutional health service" that required CON approval.

OCGA § 31-6-40 (a) establishes when a new institutional health service requires a CON and provides, in relevant part:

(a) On and after July 1, 2008, any new institutional health service shall be required to obtain a certificate of need pursuant to this chapter. New institutional health services include:

. . .

(5) Clinical health services which are offered in or through a health care facility, which were not offered on a regular basis in or through such health care facility within the 12 month period prior to the time such services would be offered; [and]

(6) Any conversion or upgrading of any general acute care hospital to a specialty hospital or of a facility such that it is converted from a type of facility not covered by this chapter to any of the types of health care facilities which are covered by this chapter[.]

See also *Premier Health Care Investments v. UHS of Anchor*, 310 Ga. 32, 35-36 (2)
(a) (849 SE2d 441) (2020).

The superior court's conclusion ignores additional statutory language and rules
that reflect a clear intent to treat short-stay and long-term beds differently. First,
OCGA § 31-6-21 (b) (8) requires the DCH to

> establish, by rule, need methodologies for new institutional health
> services and health care facilities. . . . The [DCH] shall establish
> service-specific need methodologies and criteria for *at least* the
> following clinical health services: short stay hospital beds[.]"

(Emphasis supplied.) To that end, the DCH promulgated "Specific Review
Considerations for Short-Stay General Hospital Beds" (see Ga. Comp. R. & Regs. r.
111-2-2-.20) and "Specific Review Considerations for Long Term Care Hospitals"
(see Ga. Comp. R. & Regs. r. 111-2-2-.36). Accordingly, the CON process evaluates
each category of hospital differently.

Second, the two types of hospitals are defined differently based upon the
services they provide. A "'[s]hort stay hospital' or 'hospital' is defined as a facility
with an average length of stay of less than thirty (30) days." Ga. Comp. R. & Regs.
r. 111-2-2-.20 (2) (n).

21

"Long Term Care Hospital" or "LTCH" or "Long Term Acute Care Hospital" or "LTACH" means a hospital that is classified as a long term hospital by the Medicare program pursuant to 42 CFR 412.23(e). *These hospitals typically provide extended medical and rehabilitative care for patients who are clinically complex and may suffer from multiple acute or chronic conditions. Services typically include comprehensive rehabilitation, respiratory therapy, head trauma treatment, and pain management.*

(Emphasis supplied.) Ga. Comp. R. & Regs. r. 111-2-2-.36 (2) (d). Moreover, according to federal regulations, to be so classified, long-term care hospitals "must have an average Medicare inpatient length of stay of greater than 25 days (which includes all covered and noncovered days of stay of Medicare patients)[.]" 42 CFR 412.23 (e) (2) (i).

Third, this distinction is represented in the evidence provided to the hearing officer during WellStar's appeal from the DCH's initial determination. Between 1973 and 1996, it is undisputed that Windy Hill operated as a short-term general acute care hospital. When it contacted SHPA in 1996, Windy Hill specifically stated that it wanted to operate "a long-term acute care hospital pursuant to 42 CFR 412.23 (e) (1) and (2)." Windy Hill also indicated it would "convert its emergency room department to a minor emergency facility ("Immediate Care Department")." After the SHPA

22

notified Windy Hill that it would not need CON approval in order to convert the hospital to a long-term care hospital, Windy Hill received a permit to operate a "Specialized Long Term Acute Care Hospital." Thereafter, Windy Hill operated as a long-term care hospital for the next 23 years. In its Annual Hospital Questionnaire sent to DCH each year from 2015 to 2018 inclusive, Windy Hill noted that it maintained a permit to operate a "Specialized Long-Term Acute Care Hospital" and that it had no emergency room or any beds other than long-term care hospital beds — including no short-stay hospital beds.

These factors indicate a clear legal distinction between short-stay general acute care hospitals and long-term care hospitals, and demonstrate that Windy Hill was being operated as a long-term care hospital. That there may be a minimal level of overlap between the two categories does not alter the fact that the categories are defined differently, evaluated differently, reported differently, and provide different levels of care.[8] According to Windy Hill's own evidence, it maintained 47 long-term

___

[8] Moreover, despite any overlap in the manner of care provided by short-stay general acute care hospitals and long-term care hospitals, the regulations lawfully promulgated by the DCH note that a long-term care hospital generally provides "extended medical and rehabilitative care for patients who are clinically complex and may suffer from multiple acute or chronic conditions[,]" including "comprehensive rehabilitation, respiratory therapy, head trauma treatment, and pain management." Ga. Comp. R. & Regs. r. 111-2-2-.36 (2) (d). There are no such limitations on the role of

23

care hospital beds, and *only* long-term care beds, when it sought to convert its entire complement of 115 beds to short-stay beds in 2019, after having operated as a long-term care hospital for more than 20 years. As a result, Windy Hill's annual reporting confirmed that it did not maintain any beds for pediatric care, gynecological care, general medicine, general surgery, or medical/surgical care.[9] Under these facts, the DCH commissioner was authorized to find that Windy Hill's proposed conversion constituted a "new institutional health service" that required prior CON review and approval. See OCGA § 31-6-40 (a) (5) (stating that a new institutional health service includes "[c]linical health services which are offered in or through a health care facility, which were not offered on a regular basis in or through such health care facility within the 12 month period prior to the time such services would be offered").[10] Because the superior court impermissibly equated the two categories to

_____

a short-stay general acute care hospital.

[9] For this reason, coupled with WellStar's 1996 surrender of its "General Hospital" permit, WellStar's arguments — that short-stay care and long-term care are essentially the same and encompassed under a broad "clinical health service" or "medical-surgical care" umbrella — are unavailing.

[10] Furthermore, we find unpersuasive WellStar's argument, based upon OCGA § 31-6-40 (a) (6), that it is entitled to forego the CON process because a CON would only be required for "the conversion or upgrading of any general acute care hospital to a specialty hospital but not the converse" in view of the application of OCGA § 31-

24

hold that Windy Hill did not need prior CON approval, and finding no basis to reverse the DCH commissioner's decision under OCGA § 31-6-44.1, we again conclude that the superior court erred in reversing the final agency decision.

4. Finally, in two interrelated enumerations of error, Emory asserts that the superior court erred in finding that WellStar had a "vested right" to "provide [long-term care hospital] services while retaining its status as a general acute care hospital" and that reversing the DCH commissioner's decision "avoids an unconstitutional result," which, Emory argues, itself results in an unconstitutional application of the rules and statutes governing the CON program.[11] We conclude that WellStar did not

---

6-40 (a) (5).

[11] The Supreme Court of Georgia "has exclusive jurisdiction over all cases involving construction of the Constitution of the State of Georgia and of the United States and all cases in which the constitutionality of a law, ordinance, or constitutional provision has been called into question." *Atlanta Independent School System v. Lane*, 266 Ga. 657 (1) (469 SE2d 22) (1996); accord Ga. Const. of 1983, Art. VI, Sec. VI, Par. II (1). However, this Court has "limited jurisdiction to review constitutional questions." *City of Decatur v. DeKalb County*, 284 Ga. 434, 436 (2) (668 SE2d 247) (2008). As a result, we have jurisdiction over cases that "involve the application, in a general sense, of unquestioned and unambiguous provisions of the Constitution to a given state of facts and that do not involve construction of some constitutional provision directly in question and doubtful either under its own terms or under the decisions of the Supreme Court of Georgia or the Supreme Court of the United States." Id. (punctuation omitted). Here, it is not clear that a constitutional question was squarely raised below. Furthermore, the resolution of the question appears to involve the application of settled constitutional law. Under these

25

have a vested right to remain a general acute care hospital throughout its operation as a long-term care hospital.

In its order, the superior court tacitly found that Windy Hill had a vested right to operate as a short-stay general acute care hospital based upon the 1996 letter from SHPA.[12] As a result, the superior court concluded that

> [e]ven if "short-stay beds" and "long-term beds" were distinct clinical health services, [the] DCH cannot interpret its later-adopted rules to retroactively take away Windy Hill's vested right to provide both short-stay and long-term medical-surgical care. As reflected by the 1996 [SHPA letter], Windy Hill had a right to provide [long-term care hospital] services while retaining its status as a general acute care hospital. That right — expressly recognized in a ruling from the state CON agency — has never been relinquished. Thus, even if [the] DCH's subsequent adoption of separate rules for Short-Stay Hospital Beds and Long Term Care Hospitals created distinct clinical health services, Windy Hill had already vested its right to offer long-term beds while

circumstances, jurisdiction is proper in this Court.

[12] The superior court's order does not make an express finding that Windy Hill has a vested right. Even to the extent it made such a finding, the order contains no analysis explaining how the superior court determined that Windy Hill's prior operation as a short-stay general acute care hospital qualified as a vested right. Rather, it simply refers to the Georgia Constitution's prohibition against applying laws "retroactively so as to impair vested rights."

retaining its general acute care CON authorization, including offering medical-surgical care.

Our Supreme Court "has said that the term vested rights means interests which it is proper for the state to recognize and protect and of which the individual cannot be deprived arbitrarily without injustice." (Citation and punctuation omitted.) *Deal v. Coleman*, 294 Ga. 170, 177 (2) (a) (751 SE2d 337) (2013). However, "'vested rights' must be *private* rights, and *public* rights — those rights that belong to the People in common — can be modified by the elected representatives of the People prospectively or retroactively, as they see fit." (Emphasis supplied.) Id. at 181 (2) (a). Furthermore, like the Open Records Act at issue in *Deal*, the CON laws were "enacted for the protection of the public, and not for the benefit of any particular individual or calling." (Citation and punctuation omitted.) See id. at 180 (2) (a); see also OCGA § 31-6-1 (stating that public policy supporting CON laws is "to ensure access to quality health care services and to ensure that health care services and facilities are developed in an orderly and economical manner and are made available *to all citizens* and that only those health care services found to be *in the public interest* shall be provided in this state") (emphasis supplied); *Cobb Hosp.*, 349 Ga.

App. at 456 (1) (a) (finding that "the public is better served by having experts in the complexities of health care planning make . . . decisions").

Here, the superior court concluded, in effect, that Windy Hill is free to operate either long-term beds or short-stay beds because Windy Hill was grandfathered into the CON program. This was error. It is true that, when the CON regulation was enacted, it did not apply to those facilities that pre-existed the legislation. See *HCA Health Svcs. v. Roach*, 263 Ga. 798, 800 (3) (a) (439 SE2d 494) (1994), overruled on other grounds by *Marsh v. Clarke County School District*, 292 Ga. 28 (732 SE2d 443) (2012). Such "grandfathering" applies to facilities that "existed and *performed the same services* prior to the CON program in 1979." (Emphasis supplied.) Id. at 801 (3) (a). In other words, facilities were allowed to continue operating in the same manner as they had operated prior to the enactment of the CON laws. See also OCGA § 31-6-40 (c) (1) ("Any person who had a valid exemption granted or approved by the former Health Planning Agency or the department prior to July 1, 2008, shall not be required to obtain a certificate of need in order to continue to offer those previously offered services.").

Prior to 1979, Windy Hill operated as a short-term general acute care hospital.[13] Therefore, due to the ability to be "grandfathered" in, Windy Hill continued to operate as a short-stay general acute care hospital after the CON laws became effective in 1979. In 1996, Windy Hill transformed from a short-stay hospital to a long-term care hospital and thus no longer provided the same services it provided prior to the CON program in 1979. Under these circumstances, WellStar relinquished any right it had obtained by operation of being grandfathered to operate as a short-stay hospital.[14]

---

[13] In its initial determination, the DCH noted that Windy Hill "originally operated as a short-stay hospital with 165 beds. The Georgia CON statute became effective in 1979[;] as a result Windy Hill's operation of its short-stay hospital was grandfathered under the law." Indeed, Windy Hill acknowledged as much, stating in its CON application that "[s]ince its founding in 1973, WellStar Windy Hill had operated as a general acute care short-stay hospital."

[14] In fact, to the extent the 1996 letter conveyed any right at all, it granted Windy Hill the right to operate as a long-term care hospital — just as Windy Hill sought. See Ga. Comp. R. & Regs. r. 111-2-2-.10 (1) (a) ("Determinations are conclusions of the Department that are based on specific facts and are limited to the specific issues addressed in the request for determination, as applicable. Therefore, the conclusions of a specific determination shall have no binding precedent in relation to parties not subject to the request and to other facts or factual situations that are not presented in the request."). As we have noted, after the SHPA issued its 1996 letter, Windy Hill received a new permit authorizing it to operate as a "Specialized Long Term Acute Care Hospital," and returned its former permit, which had authorized Windy Hill to operate as a "General Hospital" and which the SHPA marked as "Void."

Furthermore, as the DCH commissioner found, and contrary to WellStar's argument, concluding that a facility is entitled to switch back and forth between operating short-stay and long-term beds undermines the purpose of the CON program. As a matter of express public policy, OCGA § 31-6-1 requires the DCH to ensure that health care services and facilities are provided in a manner that is cost-effective and that avoids the unnecessary duplication of services. If Windy Hill, or any other facility, retains a purported right to unilaterally change the nature of the services it offers, the DCH would be precluded from fulfilling its legislatively-mandated regulatory role, and the codified public policy underlying the CON process would be rendered meaningless. We cannot read the relevant rules and statutes in such a way. See generally *Langley v. Langley*, 279 Ga. 374, 376 (1) (613 SE2d 614) (2005) (holding that, in case where enforcement of an agreement was a matter of public policy, "considerations of public policy cannot be ignored").

Finally, having failed to demonstrate a vested right to operate as a short-stay general acute care hospital, it necessarily follows that WellStar cannot show a violation of its constitutional rights.[15] The superior court erred in holding otherwise.[16]

---

[15] In its motion for summary adjudication before the CON Appeal Panel, WellStar argued that Emory's proposed reading of certain CON regulations "would cause an unconstitutional retroactive impairment of WellStar Windy Hill's vested

30

5. In Case No, A22A0112, the DCH asserts that the superior court: (1) relied upon an unreasonable interpretation of the facts; (2) misinterpreted the rules governing CONs; (3) misinterpreted the term "clinical health services"; (4) erroneously found that reversing the DCH's determination avoids an unconstitutional result; and (5) erred in finding that the DCH's determination was arbitrary and capricious.

However, in view of our decision in Case No. A22A0111 reversing the superior court's order granting WellStar's petition for judicial review, we need not consider the DCH's enumerations of error. Accordingly, Case No. A22A0112 is

---

rights to remain a general acute care hospital throughout operation as [a long-term care hospital.]" Therefore, WellStar properly raised the argument during the agency proceedings, and the superior court was authorized to consider WellStar's argument. See *Cobb Hosp. v. Dept. of Community Health*, 357 Ga. App. 358, 360 (850 SE2d 831) (2020) ("A party aggrieved by a state agency's decision must raise all issues before that agency and exhaust available administrative remedies before seeking any judicial review of the agency's decision.") (citation and punctuation omitted).

[16] We need not consider Emory's remaining enumeration that the superior court failed to address its argument that WellStar's proposal resulted in a new short-stay general acute care hospital without obtaining a new CON. See OCGA § 31-6-40 (a) (1).

dismissed as moot. See generally *Turner Outdoor Advertising v. Werco*, 194 Ga. App. 14, 15 (2) (389 SE2d 778) (1989).

In sum, we conclude that the superior court erred in finding that: (1) "Windy Hill is entitled to automatic reversion of its beds to short-stay status under [Ga. Comp. R. & Regs. r.] 111-2-2-.36 (2) (d)[;] because Windy Hill was not a '[a] hospital that [had] been approved through the Certificate of Need process[;]'" (2) a long-term care hospital and a short-stay general acute care hospital are legally the same "clinical health service," such that a new CON is not required to switch from one category of hospital to the other; and (3) WellStar had a "vested right" to "provide [long-term care hospital] services while retaining its status as a general acute care hospital" and that reversing the DCH commissioner's decision "avoids an unconstitutional result[.]" Therefore, we reverse the superior court's judgment in Case No. A22A0111 and dismiss Case No. A22A0112 as moot.

*Judgment reversed in Case No. A22A0111. Appeal dismissed as moot in Case No. A22A0112. Barnes, P. J., and Brown, J., concur*.