319 Ga. 465
FINAL COPY

S23Y1211. IN THE MATTER OF SUSAN MICHELE BROWN.

PER CURIAM.

This disciplinary matter is before the Court on the petition for voluntary discipline filed by Respondent Susan Brown (State Bar No. 090043) before the issuance of a formal complaint. See Bar Rule 4-227 (b). In the petition, Brown, who has been a member of the State Bar of Georgia since 1997, admits that she "may have" violated Rules 1.15 (I) (c) and 1.15 (II) (b) of the Georgia Rules of Professional Conduct ("GRPC") while serving as the successor trustee of a South Carolina trust—even though the Bar acknowledges that she was acting only in a fiduciary capacity, and not as a lawyer, at the time.[1]

---

[1] Brown admits that she "was not acting as an attorney in her capacity as the successor trustee," but that she was acting as a "fiduciary, and that as such, her conduct may be a violation of" Rules 1.15 (I) (c) and 1.15 (II) (b). Pet. Voluntary Discipline at 6. Brown is willing to accept discipline up to and including a suspension of between one to six months if her conduct did violate Rules 1.15 (I) (c) and 1.15 (II) (b). Id. at 7, 10.

The Bar asserts that Brown violated Rules 1.15 (I) (c) and 1.15 (II) (b) and requests a suspension of between three and six months.

We ultimately conclude that Brown's conduct did not violate Rule 1.15 (I) (c) or 1.15 (II) (b). As we explain below, the text of Rules 1.15 (I) (c) and 1.15 (II) (b) does not clearly indicate whether these Rules apply to lawyers when they are acting as fiduciaries not in connection with the legal representation of a client or otherwise in the practice of law. Even after applying rules of statutory construction, either reading of Rules 1.15 (I) (c) and 1.15 (II) (b)— that they do, or do not, apply to lawyers acting as fiduciaries but who are not engaged in legal representation of a client or in the practice of law—is plausible. However, applying these Rules to lawyers when they are not practicing law would raise serious constitutional concerns, which we set out below. As a result, under the canon of constitutional doubt, we interpret Rules 1.15 (I) (c) and 1.15 (II) (b) such that they do not apply to lawyers when they are acting as fiduciaries not in connection with the legal representation of a client or otherwise in the practice of law. Because Brown's

conduct at issue in this matter falls outside our interpretation of Rules 1.15 (I) (c) and 1.15 (II) (b), we conclude that Brown's conduct did not violate those Rules. We therefore reject her petition for voluntary discipline.

1. *Admitted Facts*

In her petition, Brown explains that M. B. J. is a beneficiary of two trusts: one created in 2014 by M. B. J.'s father's Last Will and Testament ("Trust under Will") and one created in 1999 by her father's Irrevocable Trust ("MBJ Trust") (collectively, "Trusts"). Both Trusts were created under the laws of South Carolina, and J. J. W. (M. B. J.'s sister) was a successor trustee for both Trusts prior to Brown taking over that role. Brown did not draft the will or either of the Trusts and did not serve as a lawyer for the Trusts, the trustee, or any beneficiary in prior litigation undertaken to revise the terms of the Trusts so that an individual could serve as a successor trustee. In 2018, M. B. J. expressed concern about J. J. W.'s handling of the Trusts and requested that J. J. W. resign as the trustee over M. B. J.'s two Trusts. At that point, Brown was

3

contacted and asked if she would consider acting as successor trustee for the Trusts, and she agreed to do so for a fee and in her "individual capacity," rather than as a lawyer as she was not licensed to practice law in South Carolina.[2] J. J. W. agreed to those terms and filed, through her counsel, a motion to appoint Brown as successor trustee. On September 24, 2018, the court granted the motion.

Brown promptly established separate Trust banking accounts to receive the Trusts' financial assets. J. J. W. transferred funds into these respective accounts both initially and as other non-cash assets were sold. During Brown's term as trustee, she disbursed funds for the benefit of M. B. J. as permitted under the Trusts (i.e., rent, allowance, medical treatment, utilities, debts, vehicle, etc.); made disbursements directly to third-party vendors or by cash, check or wire transfer into M. B. J.'s personal bank accounts, as M. B. J. requested; and made investments as permitted under the terms of

---

[2] It is undisputed that Brown is not licensed to practice law in South Carolina, and nothing in the Bar's filings in this case claims that Brown was engaged in the unauthorized practice of law in South Carolina.

the Trusts, including the purchase and sale of securities and real property. Brown asserts that the purchase and sale of real estate was done with M. B. J.'s knowledge; was consistent with the prior trustee's investment strategy; and was permitted under the terms of the Trusts.

Brown discussed with M. B. J. and the person then holding M. B. J.'s power of attorney their interest in pursuing opportunities for investments in the Bahamas and U.S. Virgin Islands ("USVI"). Brown's daughter, who lived in the USVI, presented an opportunity for her to purchase a house that had sustained hurricane damage for a reduced price. Brown, who contends that the Trust Instruments allowed for debt as an investment vehicle, investigated the property and believed that a loan would be a sound investment for the Trusts given the then-existing interest rates. According to Brown, the terms of the Trusts allowed for loans and contained no prohibitions as to the relationship between the borrower and the trustee. Brown obtained a promissory note for the Trust's benefit with an interest rate of 10 percent for a principal sum of $179,000—

though she later realized that the promissory note did not state the correct amount of the debt, which she says should have been $188,900—and had the funds transferred via wire directly to the closing attorney for her daughter's purchase of the property in the USVI.[3] She asserts that the error was unintentional but admits that because of the mistake, she had not secured the distributions from the Trust with a note that accurately reflected the terms of the loan.

Several months later, after differences arose between J. J. W., M. B. J., and a third sister, J. J. W. filed a petition to alter, amend, or remove Brown as successor trustee of the Trusts and a hearing was set for November 7, 2019. In response, Brown voluntarily filed an affidavit of resignation, which the South Carolina probate court accepted. Brown contends that she was released from attending the hearing, which she was told would be cancelled in any event. But J. J. W.'s counsel went forward with the hearing and, as a result, an order was entered, which barred Brown from having any further

---

[3] Brown says that she made this realization when she began preparing a "response to the Bar."

access to the Trusts' accounts; appointed a new Special Trustee; and directed that Brown provide a full accounting by November 21, 2019. Brown asserts that she could not complete the accounting in that short of a time frame, partly because she had been locked out of the Trusts' electronic accounts and retained no paper records of those accounts and partly because of her own health issues and those of her ailing mother. Therefore, she obtained an extension through January 15, 2020, but she also missed that deadline because of what she characterizes as a "distress[ed]" emotional state related to health concerns, and also because she was missing some of the financial records she had requested but had not yet received. At a February 27, 2020 hearing in the South Carolina probate court, Brown was held in contempt but given another 30 days in which to provide the full accounting. To help her prepare the full accounting, Brown hired her own South Carolina counsel, "secured at her own expense." Brown provided the full accounting in April 2020, with the assistance of her South Carolina counsel, and she asserts that her final accounting has not been challenged.

According to Brown, the promissory note related to the USVI property did not come due prior to Brown's withdrawal as successor trustee, and the Special Trustee made no effort to enforce the note. Nevertheless, after discussion with the newly-appointed Special Trustee, a mortgage was obtained on Brown's daughter's USVI property and the funds were sent to Brown's South Carolina counsel to hold pending a written agreement with the Trust. No further action was taken in the South Carolina probate court matter, and the parties have since entered into a written, confidential settlement agreement resolving all issues, including compliance with the probate court's November 7, 2019 and February 27, 2020 orders, as well as responsibility for attorney fees. Brown asserts that, as part of the settlement agreement, the Trusts have been fully restored as to the USVI transaction; that she has satisfied all obligations under the settlement agreement; and that the probate matter in the South Carolina court has been dismissed with prejudice.

2. *The Parties' Positions as to the Alleged Rule Violations*

(a) *The State Bar's position.*

The Bar concedes that Brown was not practicing law or otherwise acting in her capacity as a lawyer during her service as the successor trustee to the Trusts. It nevertheless asserts that, as a trustee, Brown was acting as a fiduciary and that she is therefore subject to the disciplinary jurisdiction of the State Bar for acts undertaken in that capacity—even if she was not engaged in the practice of law. It thus contends that Brown has violated Rules 1.15 (I) (c)[4] and 1.15 (II) (b).[5]

---

[4] Rule 1.15 (I) (c) says:

> Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property."

[5] Rule 1.15 (II) (b) says:

No personal funds shall ever be deposited in a lawyer's trust account, except that unearned lawyer's fees may be so held until the same are earned. Sufficient personal funds of the lawyer may be kept in the trust account to cover maintenance fees such as service charges on the account. Records on such trust accounts

The Bar reasons that, while some of the GRPC expressly regulate a lawyer's conduct only while the lawyer is practicing law or in connection with a representation, see, e.g., Rule 1.15 (I) (a)[6] and (d),[7] others, including Rules 1.15 (I) (c) and 1.15 (II) (a)[8] and (b),

---

shall be so kept and maintained as to reflect at all times the exact balance held for each client or third person. No funds shall be withdrawn from such trust accounts for the personal use of the lawyer maintaining the account except earned lawyer's fees debited against the account of a specific client and recorded as such."

[6] Rule 1.15 (I) (a) says:
A lawyer shall hold funds or other property of clients or third persons that are in a lawyer's possession in connection with a representation separate from the lawyer's own funds or other property. Funds shall be kept in one or more separate accounts maintained in an approved institution as defined by Rule 1.15 (III) (c) (1). Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and other property shall be kept by the lawyer and shall be preserved for a period of six years after termination of the representation."

[7] Rule 1.15 (I) (d) says:
When in the course of representation a lawyer is in possession of funds or other property in which both the lawyer and a client or third person claim interest, the property shall be kept separate by the lawyer until there is an accounting and severance of their interests. If a dispute arises concerning their respective interests, the portion in dispute shall be kept separate by the lawyer until the dispute is resolved. The lawyer shall promptly distribute all portions of the funds or property as to which the interests are not in dispute."

[8] Rule 1.15 (II) (a) says:

apply to a lawyer's conduct outside of a legal representation of a client and regardless of whether the lawyer is engaged in the practice of law. Specifically, with respect to Rule 1.15 (I) (c)—which the Bar says applies to lawyers who receive "funds or other property in which a client or third person has an interest," regardless of whether the receipt was in connection with a legal representation or in connection with the practice of law—the Bar contends that Rule imposed upon Brown a duty to maintain complete records of the fiduciary funds in her possession and to promptly render an accounting of trust property upon request—neither of which she did, despite being given multiple extensions by the South Carolina court to do so. The Bar's view of Rule 1.15 (II) (a) is similarly expansive: it contends that the Rule requires lawyers, like Brown, "who receive[ ]

Every lawyer who practices law in Georgia, whether said lawyer practices as a sole practitioner, or as a member of a firm, association, or professional corporation, and who receives money or property on behalf of a client or in any other fiduciary capacity, shall maintain or have available one or more trust accounts as required by these Rules. All funds held by a lawyer for a client and all funds held by a lawyer in any other fiduciary capacity shall be deposited in and administered from a trust account."

11

money or property on behalf of a client *or in any other fiduciary capacity*," to deposit and administer such funds from a trust account (although not necessarily an IOLTA).[9] See Rule 1.15 (II) (a) (emphasis added). Noting that Brown, in fact, maintained multiple trust accounts for the purpose of holding the fiduciary funds she received, the Bar contends that, because the fiduciary funds were held in trust accounts, Brown was required to comply with the other obligations set out in Rule 1.15 (II) as to those accounts. The Bar then argues that, in this case, Brown violated Rule 1.15 (II) (b)— which provides, in relevant part, that "[n]o funds shall be withdrawn from [the] trust accounts [referenced in Rule 1.15 (II) (a)] for the personal use of the lawyer maintaining the account except earned lawyer's fees debited against the account of a specific client and recorded as such"—when she made Trust assets in her possession available to a family member by providing a loan to her daughter for

---

[9] Brown is not charged with a Rule 1.15 (II) (a) violation, but the Bar points to that Rule as context for interpreting Rule 1.15 (II) (b). Bar Supp. Br. at 2, 5 n.5.

the purchase of real property.[10] The Bar further contends that Brown failed to protect the Trusts' assets by failing to properly secure the debt.

(b) *Brown's position.*

Brown admits that she was acting as a fiduciary with regard to the Trusts, and that, if the Rules allow for disciplining lawyers who are not engaged in the practice of law and if this Court views her conduct as the Bar does, her conduct *may* amount to a violation of Rules 1.15 (I) (c) and 1.15 (II) (b).[11] Brown asserts, however, that the

---

[10] We note that the GRPC do not provide a definition for the term "personal use," that the Bar offers none, and that no evidence was presented on this point because this matter has been presented to this Court by way of voluntary petition. Cf. *In the Matter of Palazzola*, 310 Ga. 634, 646-647 (853 SE2d 99) (2020) (noting that in construing Rule 8.4 (a) (4), this Court had not "set forth a clear construction of the term 'professional conduct' as used in [the Rule], in general or in the particular context of law firm management").

[11] More specifically, with regard to the alleged violation of Rule 1.15 (I) (c), Brown acknowledges the Bar's position that her delay in providing an accounting violated the Rule, but contends that, while there *was* a delay, she eventually did provide an accounting in April 2020 and no one has raised any issues as to that accounting. With regard to the alleged violation of Rule 1.15 (II) (b), she asserts that no funds from the Trusts were ever commingled in her IOLTA/Trust Account because she properly established and maintained separate trust accounts for each of M. B. J.'s Trusts at a reputable financial institution and held those accounts separate and apart from her own IOLTA/Trust account. Nevertheless, she admits that she used assets of the MBJ Trust to provide a loan to her daughter for the purchase of real property

13

Bar's position that her conduct violates the Rules is anchored in Rule 1.15 (II) (a)'s language purporting to extend that Rule's application to any lawyer who holds funds or other property "in any other fiduciary capacity," and she notes that there is no authority interpreting that phrase as used in the Rule. Among other arguments, Brown asserts that the Bar's expansive interpretation is inconsistent with the plain and ordinary meaning of the text contained in Rules 1.15 (I) and (II); does not give members of the Bar notice of such broad implications; and "creates ambiguity when viewed in context of the inherent authority of this Court to govern the practice of law." She contends that the plain and ordinary meaning of these two Rules, especially when viewed in context, reveals that the more reasonable interpretation is that the Rules are limited to conduct involving the practice of law and do not reach a

---

(as was allowed by the Trust documents); that she unintentionally secured the loan with a note that did not sufficiently cover the loan amount; and that she, therefore, technically failed to protect the Trusts' assets. Brown asserts that, if the types of trust accounts referenced in Rule 1.15 (II) (b) encompass M. B. J.'s Trusts (as opposed to only IOLTA trust accounts) and if the loan to her daughter constitutes "personal use" of Trust funds under the facts of this case—then she "admits her conduct did not conform with" Rule 1.15 (II) (b).

14

lawyer's private conduct simply because the lawyer is a member of the State Bar of Georgia.

3. *Analysis*

In construing the Georgia Rules of Professional Conduct, we first look to the text of the relevant Rules, which we construe "'according to the principles that [ ] ordinarily apply in the interpretation of legal text.'" *In the Matter of Mignott*, 317 Ga. 764, 766 (893 SE2d 891) (2023) (quoting *In the Matter of Palazzola*, 310 Ga. 634, 649-650 (853 SE2d 99) (2020) (Peterson, J., concurring specially)). "[W]e must afford the statutory text its plain and ordinary meaning, we must view the statutory text in the context in which it appears, and we must read the statutory text in its most natural and reasonable way, as an ordinary speaker of the English language would." *Deal v. Coleman*, 294 Ga. 170, 172-173 (751 SE2d 337) (2013) (cleaned up). But when the language "is not obvious on its face," we should employ other "tools of construction" to interpret it and resolve its meaning. See *City of Guyton v. Barrow*, 305 Ga. 799, 803-805 (828 SE2d 366) (2019) (noting that the principles of

15

interpretation discussed and applied in *Deal* "apply to all positive legal rules" and applying them to agency regulations).

(a) *One reading of the text of Rules 1.15 (I) (c) and 1.15 (II) (b) suggests that its scope is so broad that it could apply to a lawyer acting as a fiduciary outside of a legal representation of a client or otherwise outside the practice of law.*

With these principles in mind, we begin by observing important context about the Rules at issue here: Rules 1.15 (I), 1.15 (II), and 1.15 (III) set out a lawyer's duties and obligations in maintaining, accounting for, resolving conflicts as to, and distributing funds and other property that come in her possession. Rule 1.15 (I) speaks generally about a lawyer's duties and obligations when she comes into possession of funds or other property in which her client or a third person may have an interest, while Rule 1.15 (II) specifies that a lawyer who receives money or property on behalf of a client or in a fiduciary capacity must maintain a specific type of trust account, hold the funds and other property separate from his own funds, and administer the funds or

16

property from the trust account. Finally, Rule 1.15 (III) sets out more specific rules for a lawyer's trust account, including various record-keeping requirements.

With regard to the specific Rules at issue in this case, we turn first to the text of Rule 1.15 (I) (c), which provides that:

> Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.

Viewed in isolation, the text of Rule 1.15 (I) (c)—which seems to apply generally to "lawyers" who have "receiv[ed] funds or other property" and contains no express limitation on its application to "lawyers"—does not appear to require that funds be obtained in connection with a legal representation of a client or in the practice of law for a lawyer's conduct to be covered by this Rule. That view is supported by the repeated references to a lawyer's duties in relation to a "client *or* third person"; although the first part of that phrase

17

(which references a "client") suggests that the Rule may apply only to lawyers acting within the scope of a legal representation of a client, the second part of that phrase ("or third person") arguably expands the scope of the Rule and suggests that it may apply even apart from an attorney-client relationship or other legal representation of a client.[12] Also lending support for such a reading is the fact that other subsections of Rule 1.15 (I) include language expressly limiting their application to actions taken in connection with a representation,[13] whereas subsection (c) contains no such limiting language. Applying the canon of statutory interpretation known as expressio unius est exclusio alterius (the expression of one thing implies the exclusion of others), the omission of such limiting language in subsection (c) would support the view that subsection

---

[12] Moreover, Comment 1 to Rule 1.15 (I), which provides that "[a] lawyer should hold property of others with the care required of a professional fiduciary," arguably could be viewed as elevating the role of a lawyer-fiduciary so as to implicate the GRPC, even when a lawyer is not practicing law.

[13] See, e.g., Rule 1.15 (I) (a) ("[a] lawyer shall hold funds or other property of clients or third persons *that are in a lawyer's possession in connection with a representation* . . ."); 1.15 (I) (d) ("When *in the course of representation* a lawyer is in possession of funds or other property . . .") (emphasis added).

(c) applies to lawyer conduct even outside the scope of the attorney-client relationship in a variety of circumstances—including perhaps to a lawyer's participation in community activities.[14]

Turning to Rule 1.15 (II) (b), we note the relevant context that Rule 1.15 (II) generally provides additional detail on a lawyer's duties related to safeguarding certain funds or other property that come into her possession. The Rule mandates establishing a specific

---

[14] Brown contends that the Bar's expansive interpretation of Rules 1.15 (I) (c) and 1.15 (II) (b) would subject to this Court's disciplinary authority lawyer-fiduciaries "who have never practiced law but are members of the Bar, and who are employed in some fiduciary capacity, be it with a financial institution[ ]" or "brokerage and investment advisors." Brown Supp. Br. at 4 n.3. But the logical implications of the Bar's interpretation extend much further. For example, it would appear to subject to this Court's disciplinary authority the conduct of a parent (who is a lawyer) who serves as the volunteer treasurer of her child's sports team (and thus as a fiduciary) and collects funds from team members to pay the team's expenses. For another, consider a grown child (who is a lawyer) who serves as the trustee of his or her parent's trust (and thus as a fiduciary). The lawyer's conduct as trustee would fall within the Bar's disciplinary jurisdiction under the Bar's interpretation of Rules 1.15 (I) (c) and 1.15 (II) (b), even if he or she were not practicing law and were not engaged in a legal representation of a client. And all manner of a lawyer's non-legal financial dealings outside the practice of law could seemingly fall within the Bar's purported disciplinary jurisdiction under its interpretation of Rules 1.15 (I) (c) and 1.15 (II) (b): a lawyer's side-hustle flipping houses; her hobby of selling baseball cards on an e-commerce platform; or her community involvement on charitable boards. All of a lawyer's conduct outside the practice of law and outside a legal representation of a client that puts her in a fiduciary position with the money of another could subject her to the Bar's disciplinary jurisdiction under its expansive interpretation of Rules 1.15 (I) (c) and 1.15 (II) (b).

type of trust account from which a lawyer should administer the identified funds, dictates certain recordkeeping requirements, and sets out rules prohibiting commingling a lawyer's personal funds with other funds in her possession and prohibiting the lawyer's withdrawal of those funds for her own personal use (with some exceptions).

With that overview, we turn to the text of the specific subsections of Rule 1.15 (II) at issue in this case. Brown is charged with a violation of Rule 1.15 (II) (b), but because subsection (b) builds on subsection (a), we examine the text of both. Rule 1.15 (II) (a) provides that:

> Every lawyer who practices law in Georgia, whether said lawyer practices as a sole practitioner, or as a member of a firm, association, or professional corporation, and who receives money or property on behalf of a client or in any other fiduciary capacity, shall maintain or have available one or more trust accounts as required by these rules. All funds held by a lawyer for a client and all funds held by a lawyer in any other fiduciary capacity shall be deposited in and administered from a trust account.

And Rule 1.15 (II) (b) provides that:

No personal funds shall ever be deposited in a lawyer's trust account, except that unearned attorney's fees may be so held until the same are earned. Sufficient personal funds of the lawyer may be kept in the trust account to cover maintenance fees such as service charges on the account. Records on such trust accounts shall be so kept and maintained as to reflect at all times the exact balance held for each client or third person. No funds shall be withdrawn from such trust accounts for the personal use of the lawyer maintaining the account except earned lawyer's fees debited against the account of a specific client and recorded as such.

By its plain terms, subsection (a) broadly applies to lawyers "who practice[ ] law in Georgia," but it does not make clear by its express terms whether it applies only to funds or property obtained by a lawyer in the course of a legal representation of a client. Insofar as the subsection references a lawyer receiving money or property or holding funds "on behalf of a client," the text suggests that receipt of the money is related to the practice of law. But the subsection also references lawyers who receive money or property or hold funds "in any other fiduciary capacity," which—at least on its face—is so capacious that it could expand the scope of the Rule such that it covers lawyer conduct outside the practice of law. Similarly,

21

subsection (b) speaks broadly and contains no express language specifying whether its application is limited to trust accounts containing funds obtained by a lawyer in the course of a legal representation of a client.

In sum, Rule 1.15 (I) (c) could reasonably be read to apply to any lawyer who receives funds outside the scope of a legal representation of a client or outside the practice of law because Rule 1.15 (I) (c) seems to apply generally to "lawyers" who have "receiv[ed] funds or other property" and contains no express limitation on its application to "lawyers." And Rule 1.15 (II) (b) could reasonably be read as applying to *any* lawyer who obtains funds on behalf of another and acts as a fiduciary for those funds, regardless of whether the lawyer obtained the funds in the course of the legal representation of a client or as the result of the practice of law.

(b) *Another reading of the text of Rules 1.15 (I) (c) and 1.15 (II) (b) is plausible, and that reading would not apply those Rules to a lawyer acting as a fiduciary outside the representation of a client or otherwise outside the practice of law.*

But there is a second plausible interpretation of Rules 1.15 (I) (c) and (II) (b): that Rules 1.15 (I) (c) and 1.15 (II) (b) apply only when the lawyer conduct at issue involves a legal representation of a client or otherwise involves the practice of law. Turning back to Rule 1.15 (I) (c), this alternative interpretation is supported by text that repeatedly references a "client," thus suggesting that the Rule's application is limited to the context of a lawyer's legal representation of a client. And the subsection's reference to a "third person" does not defeat that interpretation, because the term "third person" supports the reasonable inference that the duties and obligations established by the subsection are owed only *within* the context of a legal representation of a client. Using the term "third

23

person"[15]—as opposed to, for example, the term "any other person"— necessarily contemplates the existence of at least two other people as the "principals" in the relationship or transaction—which, in the context of Rule 1.15 (I) (c), would be the lawyer and client, such that the scope of the Rule would be limited to situations where a lawyer comes into possession of funds or other property as the result of a legal representation of a client or the practice of law. Comment 3 to Rule 1.15 (I) adds additional support to this understanding of the Rule's scope in that it states, in relevant part, that "[t]hird parties, *such as a client's creditors*, may have just claims against funds or other property in a lawyer's custody." (Emphasis added.)

This narrower reading of subsection (c) is further supported by the in pari materia canon of statutory interpretation, which provides that statutes relating to the same subject matter, including subsections therein, should be construed together and harmonized whenever possible. See, e.g., *In the Interest of T. B.*, 313 Ga. 846, 853

---

[15] See Third Party, American Heritage Dictionary of the English Language (4th ed. 2000) (defining "third party" as "[o]ne other than the principals involved in a transaction").

(874 SE2d 101) (2022); *Land USA, LLC v. Ga. Power Co.*, 297 Ga. 237, 241 (773 SE2d 236) (2015). Here, as noted above, Rule 1.15 (I) generally establishes a lawyer's duties and obligations when she comes into possession of funds and other property of clients and third persons. Applying that canon and construing all of the subsections of Rule 1.15 (I) together in harmony suggests that they establish a lawyer's duties and obligations only as to funds or other property that come into a lawyer's possession as the result of the practice of law or in the course of a legal representation of a client. This is so because subsection (a) specifically limits its scope to funds or other property that are in the lawyer's possession *in connection with a representation* and requires that the funds or other property be held separate from the lawyer's own funds or property in a separate account at an approved institution; that the other property be appropriately safeguarded; and that proper records be maintained for six years *after termination of the representation*. See Rule 1.15 (I) (a). And, although subsection (b) does not contain an explicit limitation to actions undertaken in connection with a

25

representation, the prohibitions set out there build on the duties identified in subsection (a), and the use of legal terminology and reference to legal judgments and agreements in paragraphs (2) (i)-(iii) of subsection (b)—which preclude a lawyer from disregarding a third person's interest in funds or property where that interest is known to the lawyer *and* arose as the result of some legal proceeding, judgment, or agreement—seems to suggest that its obligations are limited to actions undertaken in connection with a representation. See Rule 1.15 (I) (b). Moreover, subsection (d) expressly limits its application to funds obtained "in the course of representation" and further builds on the lawyer's duties identified in subsection (a), specifying how to resolve disputes regarding the interests claimed by the client, the attorney, and the third person. See Rule 1.15 (I) (d). And, the duties set out in subsection (c) could also be seen as relating back to the funds described in subsection (a) in that subsection (c) builds on the lawyer's obligations as to such funds and property, imposing duties to notify, to distribute appropriately, and to provide an accounting upon request. See Rule

1.15 (I) (c). In short, when construed together and viewed in context, subsections (b) through (d) build on a lawyer's duties and responsibilities generally described in subsection (a) and could be viewed as constrained by the language of subsection (a) that is reasonably read as limiting the Rule to lawyers acting in the course of their legal representation of clients. This narrower view of the Rule is not only reasonable as a matter of textual construction, but also strikes a balance between protecting the public from unscrupulous individuals engaged in the practice of law[16] and not imposing unnecessary burdens on lawyers in other areas of their lives. Cf. *In the Matter of Palazzola*, 310 Ga. at 646 (emphasizing that the term "professional conduct" contained in GRPC 8.4 (a) (4) "is not so capacious as to encompass *everything* a lawyer does in the management of a law office (or for that matter, in life)" (emphasis in original)).

---

[16] Because the Bar concedes that Brown was not practicing law when engaged in the conduct at issue, our explanation of this narrower view of Rule 1.15 (I) (c) necessarily does not speak to that Rule's potential application to a lawyer who receives funds of third persons in connection with a representation of a client or in the practice of law.

We observe a similarly reasonable interpretation of Rule 1.15 (II) (b). In particular, as with Rule 1.15 (I) (c), the repeated references to "clients" and "third persons" in Rule 1.15 (II) (b) (which, as noted above, presupposes an existing relationship between lawyer and client principals), can plausibly be read to limit its application to trust funds involving funds received by a lawyer in connection with the practice of law.

In addition to the above analysis of the text and context of Rules 1.15 (I) (c) and 1.15 (II) (b), we note that Rules 1.15 (I), 1.15 (II), and 1.15 (III) fall under Part One of the GRPC, which is titled "Client-Lawyer Relationship." The categorization of the Rules at issue here, while not necessarily dispositive, offers additional context as to the kind of relationship that forms the framework for application of the rules that follow. Similarly, Bar Rule 4-102 [13] provides that "[the GRPC] are rules of reason. They should be interpreted with reference to the purposes of legal representation and of the law itself." That paragraph's focus on the dual purposes of "the law" and on a lawyer's representations of clients also suggests

28

that the GRPC are generally meant to regulate a lawyer's conduct while she is engaged in the representation of a client or otherwise engaged in the practice of law.[17] Taking all of these indications together, it is reasonable to read Rule 1.15 (I) (c) and Rule 1.15 (II) (b) as limited to situations in which the money or property at issue has come into a lawyer's possession by virtue of a legal representation of a client, or because the lawyer was engaged in the practice of law, and that they do not otherwise extend to a lawyer's conduct outside of a legal representation of a client or the practice of law—including if (for example) a lawyer is serving as a fiduciary outside the scope of a legal representation of a client and outside the practice of law.

---

[17] But see, e.g., Rule 8.4 (a) (2) (conviction of a felony is a violation of the GRPC) and 8.4 (a) (3) (misdemeanor conviction is a violation of the GRPC if it involves "moral turpitude where the underlying conduct relates to the lawyer's fitness to practice law"). That Rule is not at issue in this matter.

(c) *The expansive interpretation of Rules 1.15 (I) (c) and 1.15 (II) (a) and (b) the Bar advocates could result in discipline that exceeds this Court's inherent authority to regulate the practice of law.*

Faced with two plausible, alternative interpretations of the Rules at issue in this matter, we are compelled to point out that the expansive interpretation of Rules 1.15 (I) (c) and 1.15 (II) (b) the Bar advocates implicates real concerns regarding the scope of this Court's inherent authority to regulate the practice of law. We have long held that this Court has the inherent and exclusive authority to regulate the practice of law in Georgia. See *Wallace v. Wallace*, 225 Ga. 102, 109, 111 (166 SE2d 718) (1969) (recognizing that "courts have an inherent power to regulate the conduct of attorneys as officers of the court, and to control and supervise the practice of law generally, whether in or out of court" and holding that "[t]his court has long recognized the inherent power of the judiciary. . . . This means, then, when the Constitution declares that the legislative, judicial and executive powers shall forever remain separate and distinct (art. 1, sec. 1, par. 23), it thereby invests those

30

officials charged with the duty of administering justice according to law with all necessary authority to efficiently and completely discharge those duties the performance of which is by the Constitution committed to the judiciary, and to maintain the dignity and independence of the courts." (cleaned up)). But our authority to regulate the practice of law is not unbounded, see *In the Matter of Palazzola,* 310 Ga. at 650 (Peterson, J., specially concurring) (observing that "not every bad thing a lawyer does should jeopardize the lawyer's ability to work" and in evaluating Rule 8.4 (a) (4), expressing skepticism that "the inherent authority to regulate the practice of law that the Georgia Constitution vests in this Court includes the authority to adopt such a far-reaching rule even if the Court wanted to"), including because the Due Process Clause contained in the Georgia Constitution guarantees the "'right to work in one's chosen profession free from unreasonable government interference,'" see id. (quoting *Jackson v. Raffensperger*, 308 Ga. 736, 737 (843 SE2d 576) (2020)). See also *In the Matter of Fry*, 302 Ga. 370, 371 (806 SE2d 604) (2017) (noting that the "primary

purpose of a disciplinary action is to protect the public from attorneys who are not qualified to practice law due to incompetence or unprofessional conduct" and that "[a]nother important purpose . . . involves the protection of the public's confidence in the legal system" (cleaned up)). Although the outer-most bound of this disciplinary authority is not clear, what *is* clear is that the farther the effort to discipline a lawyer strays from the "'primary purpose of . . . protect[ing] the public from attorneys who are not qualified to practice law due to incompetence or unprofessional conduct,'" *Fry*, 302 Ga. at 371 (citation omitted), the greater the risk that such effort could exceed this Court's authority to impose lawyer discipline. See *In the Matter of Palazzola*, 310 Ga. at 650 (Peterson, J., concurring specially).

That concern is implicated here, where the Bar concedes that Brown was not engaged in the practice of law and nonetheless seeks discipline on the basis of Rules 1.15 (I) (c) and 1.15 (II) (b), which purport to apply not only to a lawyer's handling of funds and other property that are in her possession in connection with a legal

representation of a client—but also to a lawyer's handling of funds and other property that come into her possession wholly unrelated to the practice of law.

(d) *We apply the canon of constitutional doubt to construe Rules 1.15 (I) (c) and 1.15 (II) (b) here.*

In this case, however, we need not decide whether applying Rules 1.15 (I) (c) and 1.15 (II) (b) to Brown's conduct could require an exercise of this Court's authority that would exceed its constitutional limits, because we can apply the canon of constitutional doubt to interpret those Rules. "Under the canon of constitutional doubt, if a statute is susceptible of more than one meaning, one of which is constitutional and the other not, we interpret the statute as being consistent with the Constitution." *Premier Health Care Invs., LLC v. UHS of Anchor, L.P.*, 310 Ga. 32, 48 (849 SE2d 441) (2020) (citation and punctuation omitted). Cf. *Nordahl v. State*, 306 Ga. 15, 20 (829 SE2d 99) (2019) (noting that the canon of constitutional doubt "is a tool for choosing between competing plausible interpretations of a statutory text") (quoting

33

*Clark v. Martinez*, 543 U.S. 371, 381 (125 SCt 716, 160 LE2d 734) (2005)). Notably, this tool of construction is available only where the legal text at issue allows for competing plausible interpretations. See *Domingue v. Ford Motor Co.*, 314 Ga. 59, 68 (875 SE2d 720) (2022) (explaining that where there are not "'competing plausible interpretations of (the) statutory text,' the canon of constitutional doubt does not apply" (citation omitted)); *Crowder v. State of Ga.*, 309 Ga. 66, 73 n.8 (844 SE2d 806) (2020) ("[W]e cannot rely on th[e] canon [of constitutional doubt] to avoid the potential constitutional issue implicated by OCGA § 9-16-12 (b) (3), because we can identify only one plausible interpretation of that statute."). Because there are two competing and plausible interpretations of Rules 1.15 (I) (c) and 1.15 (II) (b), the canon of constitutional doubt applies, and we conclude that it weighs against adopting the Bar's far-reaching view that Rules 1.15 (I) (c) and 1.15 (II) (b) apply to Brown's conduct at issue here.

\*

To put a finer point on it: applying the canon of constitutional doubt to the competing, plausible interpretations of Rules 1.15 (I) (c) and 1.15 (II) (b), we adopt the narrower construction of the Rules (as articulated above) that avoids serious questions about the constitutionality of those Rules. And that narrower interpretation leads to the conclusion that Rules 1.15 (I) (c) and 1.15 (II) (b) do not apply to Brown's conduct as a fiduciary in this case, even though she is a lawyer licensed in Georgia, because her conduct does not involve a legal representation of a client or the practice of law. See *Premier Health Care Invs., LLC*, 310 Ga. at 48-49 (applying the canon of constitutional doubt to avoid an interpretation of a statute that "could raise serious questions about the constitutionality of the General Assembly's delegation of rulemaking to the Department [of Community Health]"). Consequently, we cannot say that Brown's conduct violated Rules 1.15 (I) (c) and 1.15 (II) (b) as we have construed them, and as such, we elect not to exercise our inherent authority to regulate the practice of law by imposing lawyer

discipline under these circumstances. We therefore reject Brown's petition for voluntary discipline.

*Petition for voluntary discipline rejected. All the Justices concur.*

Decided July 2, 2024.

Petition for voluntary discipline.

*Hawkins Parnell & Young, Christine L. Mast, Teresa E. Lazzaroni*, for Brown.

*Paula J. Frederick, General Counsel State Bar, William D. NeSmith III, Deputy General Counsel State Bar, Jenny K. Mittelman, Andreea N. Morrison, Assistant General State Bar*, for State Bar of Georgia.